# United States Court of Appeals
## For the First Circuit

No. 02-1237

BRADLEY B. BRIGHAM,

Plaintiff, Appellant,

v.

SUN LIFE OF CANADA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lipez, Circuit Judge,
Coffin and Stahl, Senior Circuit Judges.

Cristobal Bonifaz with whom John C. Bonifaz and Law Offices of Cristobal Bonifaz were on brief for appellant.
Jay P. Symonds with whom Joseph M. Hamilton and Mirick, O'Connell, DeMallie & Lougee were on brief for appellee.
Mary Ellen Signorille and Melvin R. Radowitz on brief for amicus curiae AARP.

January 28, 2003

**COFFIN, <u>Senior Circuit Judge</u>.**  Appellant Bradley Brigham claims that appellee Sun Life of Canada violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, when it terminated his long-term disability benefits. Brigham had been receiving benefits for five years based on his inability to perform his regular occupation.  After that time period, benefits were available under his plan only if he was disabled from performing <u>any</u> occupation for which he was or could become qualified.  Sun Life concluded that he was capable of sedentary work, and the district court found that the insurer's determination indisputably was supported by substantial evidence in the record.  Appellant argues on appeal that the court used the wrong standard and, even under the standard it used, reached the wrong result.  Although our judgment might have differed from Sun Life's were we deciding on a clean slate, on the record before us we are constrained to affirm the summary judgment.

### I. <u>Background</u>[1]

Appellant Brigham, a 47-year-old man who has been a paraplegic since a motorcycle accident when he was 16, was hired in the spring of 1990 as an employment coordinator for a social services organization.  He served as an advisor on the employment of

---

[1] We have borrowed liberally from the well stated factual background section of the district court's opinion in this case. See <u>Brigham</u> v. <u>Sun Life of Canada</u>, 183 F. Supp.2d 428-434 (D. Mass. 2002).  As the district court noted, <u>see</u> <u>id.</u> at 428, the facts are essentially undisputed.

handicapped individuals, visiting multiple employers every day. The travel required frequent transfers from his car to his wheelchair and back, and after two years on the job the repeated twisting and lifting of his chair led to significant left side and back pain that his family doctor diagnosed as muscle strain.

The employee benefit plan issued by Sun Life to Brigham's employer provides for both short-term and two stages of long-term disability benefits. Long-term benefits are available for the first sixty months of a totally disabling illness if it prevents the employee from performing "all of the material duties of his regular occupation" (emphasis added). After that initial five-year period, an employee is eligible for benefits only if the disabling condition prevents him from engaging in "any occupation for which he is or becomes reasonably qualified by education, training or experience" (emphasis added).

In June 1993, Brigham developed a respiratory tract infection that triggered severe coughing spells, exacerbating his left side pain and forcing him to stop work. He received short-term disability benefits for six months and then in December 1993 applied for long-term benefits based on his severe back and side strain. In an Attending Physician's Statement of Disability ("APS") dated December 21,[2] Dr. Christopher French opined that

_____

    [2] The APS is a two-page standardized form provided by the insurer that includes sections on "Diagnosis," "Dates of Treatment," "Progress," "Physical Impairment," "Prognosis," and

-3-

Brigham was unable to perform his own job because "the stress of frequent transfer from [his] car [is an] intolerable physical symptom." He characterized Brigham's physical impairment as "Class 4" out of five levels of progressively more limited physical capacity, signifying a "[m]oderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity." Although Dr. French stated that Brigham was totally disabled, he also observed that he was a "good candidate for more sedentary work but to do this he must get retraining." Brigham graduated from both Williams and Amherst colleges and holds a master's degree.

In February 1994, Sun Life approved the payment of the first stage of long-term disability benefits under the "own occupation" provision. He received those benefits until December 1998, when the sixty months of coverage ran out, although Sun Life temporarily cancelled benefits in January 1995 based on its belief that Brigham could at that point return to his regular job. Brigham appealed, and after further investigation, Sun Life reinstated the "own occupation" benefits in March 1995.

During the five years in which Brigham received long-term disability payments, Dr. French submitted at least six additional APS reports after the one filed in support of the original application for benefits. Because this case turns on the

"Rehabilitation." The sections typically offer several alternative answers, with boxes to be checked for the chosen response. The form also provides general space for unguided "Remarks."

sufficiency of the evidence of Brigham's ability to work, we have closely reviewed the medical information contained in the record. We summarize below Dr. French's reports during the relevant five-year period and review other details surrounding Brigham's receipt of benefits.

– March 1994. In response to a request from Sun Life for updated information, Dr. French sent a letter dated March 31 that stated:

> [Brigham] is a paraplegic who had developed left side and hip pain secondary to [the] frequent car to chair transfer his work requires. These symptoms have improved following several months of leave from work. I believe, therefore, that he should avoid situations that require frequent car to chair transfers.

– July 1994. Sun Life conducted an extensive personal interview of Brigham, and the notes in the insurer's file state that he "indicated that he would have resumed another position with his company if it did not involve being out on the road, but they had no work for him." The notes also state that Brigham reported applying to law school and indicated an interest in earning a law degree so that, among other endeavors, he could represent individuals with disabilities. He further stated that, if law school proved too demanding, he would consider earning a teaching certificate, noting that he previously had worked as a teacher in a private school.

– <u>October 1994</u>. The third APS from Dr. French,[3] dated October 12, reported that Brigham's condition remained unchanged, but the physician increased the level of his physical impairment to Class 5, a "[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity." In the section labeled "Rehabilitation," however, Dr. French indicated that Brigham could work despite his impairment if the job did not involve getting into and out of a car, and he recommended retraining.

– <u>November 1994-March 1995</u>. In a letter dated November 9, Dr. French stated that Brigham's back pain had subsided since he had stopped working, and expressed concern that a return to his previous position – with its frequent travel – would bring it back. He again recommended that Brigham "be placed in a situation that does not require getting in and out of the car all day." In a December conversation with a Sun Life representative, Dr. French

---

[3] Both the district court and Sun Life identify the October submission as the third APS, although it was at least the fourth such statement since Brigham stopped work in June 1993. Brigham had submitted two statements from Dr. French in the summer of 1993 in connection with his request for short-term disability benefits. It appears that one of those earlier reports is considered the "first" APS in the sequence discussed by the district court. Our discussion considers the seven reports that were filed between December 1993 and December 1998.

We add one further note about these reports. The briefs reflect confusion about an APS that appears to be stamped as received in February 1999. The stamped page, however, is actually the first page of the December 1998 APS, which elsewhere in the appendix is shown with a date stamp of December 10, 1998. Whatever the reason for the double-dating, it is clear that the February document is not a new APS.

reported that Brigham's condition had improved and his muscle strain had resolved. A week later, Brigham told another caller from Sun Life that he hadn't pursued either schooling or alternative work. According to Sun Life's notes, Brigham explained that "he has difficulty mobilizing himself and [his] wheelchair for extended periods during the day." On December 22, Sun Life's medical consultant, Maureen Speed, a nurse, spoke with Dr. French to clarify the assessment in the doctor's Nov. 9 letter. Based on Dr. French's information, including a statement that Brigham's return to his previous job "might" trigger a recurrence of pain, Sun Life concluded that he no longer was disabled from performing his own occupation because "the possibility of a problem recurring in and of itself does not constitute a disabling condition." In so informing Dr. French, Sun Life's claims manager also wrote that "[i]f any condition continues to exist, objective medical information to support the continued disability is necessary."

As noted above, the company reversed its position and reinstated Brigham's benefits after it received clarifying letters from Drs. French and Perri stating that Brigham's pain would "no doubt" return with repeated transfers into and out of his car. The insurer previously had confirmed with his employer that Brigham would have to transfer five to ten times a day if he resumed his previous job.

— June 1995.  Brigham responded to an inquiry from Sun Life about the impact of his disability on his daily life by stating that he is "severely limit[ed] . . . in fundamental ways."  He wrote:

> For example, it is very painful for me to transfer from my wheelchair onto the toilet, into the bathtub, into bed, and into my car.  As a result, I require assistance to perform all or part of these transfers.

— October 1995.  Dr. French submitted a fourth APS that reported Brigham's condition as unchanged, but he designated Brigham's physical impairment as both Classes 4 and 5.  The doctor again described Brigham as totally disabled, but noted in the "Remarks" section that he could re-enter the workforce "with appropriate part-time job and available transportation."

— January-February 1996.  Brigham reported that his daily activities remained "limited" because of muscle pain and that he was no longer able to independently transfer into or out of his current vehicle.  Noting that he needed a lift-equipped van "in order to attempt to either re-enter the work force or acquire appropriate professional re-training," he proposed that Sun Life buy out his disability coverage so that he could purchase a van as soon as possible.  Brigham ultimately rejected as inadequate Sun Life's approximately $52,000 settlement offer.

— November 1996.  Dr. French's fifth APS again reported Brigham's progress as "unchanged," but this time he classified his physical impairment as Class 4.  The doctor stated that a job

-8-

modification would enable Brigham to work "[t]o some extent," and in the "Remarks" section he wrote: "patient has use of upper body – transportation to and from a worksite would need to be addressed, as would assistance with transfers."

– June 1997.  Dr. French submitted his sixth APS, in which he again checked off the boxes indicating that Brigham's condition was unchanged and that he had a Class 4 impairment.  In the impairment section, he noted that "[t]ransferring is often painful and therefore difficult and slow.  Transportation is prob."  The doctor checked neither "yes" nor "no" in the section that asked if a job modification would enable Brigham to work with his impairment.  He did, however, check "no" when asked if Brigham was now totally disabled from "[a]ny other job."

– January 1998.  Dr. French's seventh APS repeated the "unchanged" condition and Class 4 impairment notations.  In a section labeled "Limitations," Dr. French reported that Brigham could sit 5-10 hours in a normal day, drive 1-3 hours, and use his hands for grasping and fine manipulating.  He also listed Brigham as able to bend, twist his body, push, pull, grasp and reach between 1% and 33% of the time during the day, and stated that he could lift a maximum of ten pounds.  Asked on the form whether Brigham could work within these limitations, Dr. French checked the box for "part time" and added "possibly."  He gave the same

response to the question whether Brigham could work in another occupation part time.

That same month, Brigham completed a "Claimant Activity Questionnaire" in which he explained that large portions of his day were consumed by eating, resting, and matters of personal hygiene. He shopped twice a week with others, sometimes made phone calls related to his volunteer work for a non-profit organization, read the newspaper and watched television news, and sometimes ran errands with the help of a neighbor or friend. On weekends, he more frequently had visitors. He reported that his balance in his wheelchair was "poor[,] so I can't do much from a sitting position," and he noted that his back and neck become stiff from sitting in the wheelchair, requiring a short afternoon nap. He stated:

> I am able to transfer into and out of my car but it takes a great deal of energy and my joints and muscles usually ache as a result. If I try to do too much I usually can't get out of bed easily the following day.

– October-December 1998. On October 27, Sun Life sent Brigham a letter explaining that his sixty months of "own occupation" benefits were about to expire and that, to continue receiving long-term disability payments, he would need to provide evidence of total disability from any occupation. Dr. French's eighth and final APS followed. Once again, Dr. French described Brigham's condition as unchanged and designated his physical impairment as Class 4. He repeated his earlier assessment regarding Brigham's

ability to sit and drive, as well as his judgment of Brigham's ability to twist, push, pull and reach (repeating his earlier percentage estimates, but increasing Brigham's maximum ability to grasp objects from 33% of the day to 66% of the day). In the only other changes from the Limitation section on the January APS, he omitted any notation on Brigham's ability to bend (one of the choices was "0%"), and checked neither "yes" nor "no" beside the entries for his ability to use his hands to grasp or manipulate with precision. He also left blank the space for Brigham's maximum lifting capacity.

In the sections on Brigham's work capabilities and prognosis, Dr. French stated that Brigham was "not at all" capable of working within the limitations noted on the form, that he was not capable of another occupation on even a part-time basis, and that he was "permanently disabled" (emphasis in original).

– January-March 1999. In response to Sun Life's request for more medical information, Dr. French in January sent copies of his handwritten notes and other reports from his file. In March, a Sun Life medical consultant who filled out a Medical Review form referred to a few items from Dr. French's difficult-to-read handwritten notes, including his July 1998 statement that Brigham was swimming every day and a May 1998 statement that Brigham was "finishing building [a] new house." The consultant noted that Dr. French in June 1997 reported that Brigham was not totally disabled

-11-

from any occupation but in December 1998 stated that he was permanently totally disabled. The final notation on the Medical Review form stated: "appears he's not restricted from sedentary work."

– June-August 1999. The insurer secured a Transferable Skills Analysis ("TSA"), which was completed by a vocational counselor primarily based on Dr. French's reports. The TSA report concluded that Brigham could perform sedentary work. Under the heading "Functional Capacities," the report, received on June 15, stated:

> He may work five to ten hours a day without limitation on grasping and fine manipulation, and may drive from one to three hours daily. He must avoid all squatting, climbing, balancing, kneeling, and crawling. However, he may be required to occasionally bend, twist his body, push, pull, and reach.

The report also noted that Brigham's lifting limitation was ten pounds. The vocational counselor concluded that these limitations were "approximately equivalent" to the definition of sedentary work contained in the Dictionary of Occupational Titles:

> Sedentary Work Exerting up to 10 pounds of force occasionally [up to 1/3 of the time] . . . or a negligible amount of force frequently . . . to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.[4]

_____

[4] Although the dictionary definition included the ability to walk or stand one-third of the time, the skills analysis was adjusted to account for Brigham's paraplegia. In addition, although the definition includes the ability to exert a negligible

The report identified twenty-one jobs for which Brigham was qualified, at least several of which required no travel other than to and from the workplace, and involved primarily verbal or telephone communication and computer skills.

On the day that it received the TSA report, Sun Life sent Brigham's attorney a letter reporting its conclusion that Brigham was not totally disabled from any occupation and thus was no longer eligible for benefits. A series of letters among Sun Life, Dr. French and Brigham's attorney followed. Dr. French sent a brief letter contesting Sun Life's conclusion.[5] In August, Sun Life's claims administrator informed the attorney that an appeal required submission of "objective medical evidence in support of continuing total disability," explaining that such evidence would include "medical records, diagnostic test results and hospital records, which document the presence of a condition to the extent it would be disabling, from December 18, 1998 to the present." The

_____

amount of force "frequently," the vocational counselor who wrote the report recognized that Brigham could push, pull, reach and similarly move only "occasionally" – consistent with Dr. French's opinion that he could do such movements between 1% and 33% of the time.

[5] To support his view, Dr. French repeated almost verbatim the observations he had made when Brigham's benefits were temporarily terminated in early 1995: "Mr. Brigham's muscular-skeletal condition is fragile, his ability to transfer is severely limited, and is possible only with assistance and then with discomfort . . . . Mr. Brigham is in a continuous state of total incapacity to perform the duties of any assignment given the disabilities described above."

administrator also sent a letter to Dr. French, dated August 24, asking for "any specific measures or any objective test results in your file that may provide information on the nature of his condition since June 1992."[6]  Dr. French subsequently spoke by phone with the claims administrator and then sent back a copy of her letter with a handwritten notation at the bottom indicating that a neurological evaluation would be obtained to answer the questions raised in the letter.[7]

– September 1999-January 2000.  By the end of the appeal period, Brigham had submitted the following materials in support of his claim: (1) Dr. French's June 28th letter disagreeing with Sun Life's determination that Brigham was not fully disabled; (2) a letter from the neurologist, Dr. Reinert, dated September 9, 1999,

---

[6] The letter also noted that Brigham had been using a wheelchair for more than 25 years, that the TSA reported available job opportunities, and that the doctor's notes indicated that the year before Brigham had been swimming every day and finishing building a new house.

[7] Appellant asserts that Dr. French's notes reflect the administrator's commitment to arrange for the evaluation. We think that, in context, this is an unreasonable reading of the notes. The notation begins "Discussed with [using a form of shorthand for "with"], and then a name written on the same line – perhaps "Anita" – is crossed out.  Below it is the name "Alice Kern."  On the next line, the notation reads: "will get Nero Eval and send it to answer above ?s." We construe this message – sent to Sun Life – to say that Dr. French had discussed with Alice Kern that he would get a neurological evaluation and would send it to answer the questions posed in Sun Life's letter.  This understanding of the notation is reinforced by the fact that such an evaluation was sent to Sun Life by Brigham's attorney.

echoing the conclusion that Brigham was totally disabled;[8] (3)

affidavits from Brigham's mother, father, aunt (who also was his

personal attendant), and a family friend describing his physical

limitations;[9] and (4) an approval notice from the Massachusetts

---

[8] The district court noted that Dr. Reinert, who first treated Brigham after his 1972 accident, offered his opinion in "almost entirely conclusory terms":

> [Brigham] feels, and rightly so in my opinion, that the physical problems resulting from those three years of employment have left him totally disabled insofar as he can no longer accomplish, on a regular schedule, what he could previously do. For example, . . . it takes him much longer to accomplish such things as management of bladder and bowel function as well as proper skin care management. At the time that he developed the left flank pain he also noted pain in his right shoulder area, making it more difficult for him to frequently lift his wheelchair into and out of the car. Were he in his early 20's instead of his late 30's at the time that this happened he may have been able to recover from the problem that developed in 1992. But with the gradual decline in physical capabilities which we all experience as we get older, in Brad's case superimposed on the significant disability of being paraplegic, he had been unable to recover to the level of function pre-1992. His problem is quite self evident and I feel that any additional studies to further evaluate the problem would be superfluous and unnecessary.

[9] These affidavits included the following comments: "From my day-to-day observations of Bradley I believe he is totally disabled in that he cannot perform routine tasks on a regular, consistent basis without experiencing pain or some level of discomfort . . . . If he tries to do too much physical activity then he is either in pain or discomfort several days after." (Lillian Brigham, appellant's mother);  "I would characterize his physical state as fragile and his muscular condition as tentative and day-to-day. He seldom has back-to-back days when he is pain-free and able to move about comfortably. . . . Based upon my daily observations from helping him for several years I would say that Bradley is fully disabled and incapable of even part-time employment." (Althea

Division of Medical Assistance for 20 hours per week of assistance with daily tasks.

In a letter dated January 28, 2000, Sun Life informed Brigham's attorney that it was reaffirming its earlier decision to terminate benefits, stating that "the information submitted did not provide objective medical support that Mr. Brigham is unable to perform the duties of any occupation for which he is reasonably qualified." The letter referred to Dr. French's earlier opinions that Brigham could perform sedentary work, the notes indicating that he was swimming every day and building a house, the TSA, and the Medical Record Review.

Brigham then filed this lawsuit claiming that Sun Life's denial of benefits violated his rights under ERISA and state law. See 29 U.S.C. § 1132(a)(1)(B). The district court ruled that the state law claims were preempted by ERISA. After a thorough review of the record evidence, the court concluded that the undisputed facts could not support a rational determination that Sun Life acted arbitrarily, see Leahy v. Raytheon Co., No. 02-1215, slip op. at 12 (1st Cir. Dec. 17, 2002), and it therefore entered summary judgment on behalf of the insurer. This appeal followed.

## II. Standard of Review

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court directed that "a denial of benefits

Brigham, aunt and personal attendant).

-16-

challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  See also Rush Prudential HMO, Inc. v. Moran, 122 S. Ct. 2151, 2170 (2002) ("[A] general or default rule of de novo review could be replaced by deferential review if the ERISA plan itself provided that the plan's benefit determinations were matters of high or unfettered discretion[.]").  We have "steadfastly applied Firestone to mandate de novo review of benefits determinations unless 'a benefits plan . . . clearly grant[s] discretionary authority to the administrator,'" Terry v. Bayer Corp., 145 F.3d 28, 37 (1st Cir. 1998) (quoting Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 583 (1st Cir. 1993)).  When the grant of discretionary authority is found, we apply a deferential arbitrary and capricious standard of judicial review.  Id. (citing Recupero v. New England Tel. and Tel. Co., 118 F.3d 820, 827 (1st Cir. 1997)).

While the choice of standards is clear-cut, there remains considerable debate over what language constitutes a sufficiently clear grant of discretionary authority to transform judicial review from de novo to deferential.  In Herzberger v. Standard Ins. Co., 205 F.3d 327, 331 (7th Cir. 2000), Chief Judge Posner proposed model "safe harbor" language for inclusion in ERISA plans that could leave no doubt about the administrator's discretion:

-17-

"'Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them.'" We wholly endorse this proposal. We recognize, however, that "courts have consistently held that there are no 'magic words' determining the scope of judicial review of decisions to deny benefits," id., and until wording such as that suggested by Judge Posner becomes standard, we must in fairness carefully consider existing language that falls short of that ideal. Accord Herzberger, 205 F.3d at 331 (declining to make proposed language mandatory and accepting as sufficient, if minimum, a less explicit standard, see infra at 19).

According to the Sun Life policy, the insurer "may require proof in connection with the terms or benefits of [the] Policy." It further states: "If proof is required, we must be provided with such evidence satisfactory to us as we may reasonably require under the circumstances" (emphasis added). Circuits that have considered similar language view the "to us" after "satisfactory" as an indicator of subjective, discretionary authority on the part of the administrator, distinguishing such phrasing from policies that simply require "satisfactory proof" of disability, without specifying who must be satisfied. See Nance v. Sun Life Assur. Co. of Canada, 294 F.3d 1263, 1267-68 (10th Cir. 2002) ("'Satisfactory to Sun Life' . . . adequately conveys to the Plan participants and beneficiaries that the evidence of disability must be persuasive to

-18-

Sun Life."); Ferrari v. Teachers Ins. and Annuity Ass'n, 278 F.3d 801, 806 (8th Cir. 2002) (describing plan as stating that "proof must be satisfactory to [the administrator]"); Herzberger, 205 F.3d at 331 (describing the "satisfactory to us" language in Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 379 (7th Cir. 1994), as "indicat[ing] with the requisite if minimum clarity that a discretionary determination is envisaged"); cf. Perugini-Christen v. Homestead Mortgage Co., 287 F.3d 624, 626-27 (7th Cir. 2002) (no discretionary review when policy stated applicant must submit "satisfactory proof of Total Disability to [the insurer]"); Walke v. Group Long Term Disability Ins., 256 F.3d 835, 839-40 (8th Cir. 2001) (same where benefits would be paid if insured "submits satisfactory proof of Total Disability to [insurer]"); Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 251-52 (2d Cir. 1999) (same where policy requires insured to "submit[] satisfactory proof of Total Disability to us"); Kearney v. Standard Life Ins. Co., 175 F.3d 1084, 1089-90 (9th Cir. 1999) (en banc) (same where policy stated that insurer would pay disability benefits "upon receipt of satisfactory written proof that you have become DISABLED").

Only the Sixth Circuit, by an 8-6 en banc vote, has held that discretionary review is triggered by language requiring "satisfactory proof" without specification of who must be satisfied. See Perez v. Aetna Life Ins. Co., 150 F.3d 550, 556-58

-19-

(6th Cir. 1998) (en banc).[10]  And only one circuit, the Second, has suggested – in dicta – that even  "satisfactory to us" language may be inadequate to convey discretion.  See Kinstler, 181 F.3d at 252. This we view as the present state of the law.  We now turn to the state of the record in this case.

Throughout the proceedings in district court, Brigham assumed that the arbitrary and capricious standard applied, never arguing, as he does now,[11] that the policy language was insufficiently explicit to trigger discretionary review.  Indeed, on more than one occasion, appellant's counsel expressly identified the issue in the case as whether Sun Life's decision was arbitrary and capricious. In light of the precedent described above, we do not feel compelled to depart from the well worn principle that "'arguments not seasonably raised in the district court cannot be raised for the first time on appeal,'" Nyer v. Winterthur Int'l, 290 F.3d 456, 460 (1st Cir. 2002) (quoting Corrada Betances v. Sea-Land Serv., Inc., 248 F.3d 40, 44 (1st Cir. 2001)); see also Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 205 n.3 (1st Cir. 1999)("Amici cannot interject into a case issues which the litigants have chosen to ignore.").

---

[10] The relevant plan language stated that "[the insurer] shall have the right to require as part of the proof of claim satisfactory evidence . . . that [the claimant] has furnished all required proofs for such benefits."

[11] He is joined in this argument on appeal by amicus AARP.

It may well be that an increasing recognition of the need for the clearest signals of administrative discretion portends a future consensus requiring greater precision. But that consensus does not yet exist. Indeed, with the possible exception of the Second Circuit in dicta, no federal appeals court has viewed the type of language at issue in this case as inadequate to confer discretion on the plan administrator. Were we to consider ruling otherwise, we would undertake a thorough exploration of the issue. As matters stand, the widespread acceptance of the view that the language here triggers discretionary review assures us that adhering to our raise-or-waive rule results in no injustice in this case.

We therefore move on to consider only whether Sun Life's decision to terminate Brigham's benefits was arbitrary and capricious. We must view this question through the summary judgment lens, leading us to examine specifically "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." Leahy, slip. op. at 12.

### III. The Termination of Benefits

As indicated at the outset of this opinion, we have concluded that a rational decision-maker could not find, on this record, that Sun Life lacked a reasonable basis for its determination that Brigham could return to work in a sedentary position. This

-21-

conclusion is especially clear with respect to part-time work. See Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998) (capacity to work part-time supports finding that claimant was not "totally disabled from any occupation"). Although we confess considerable ambivalence about whether Brigham should be expected to return to the workforce, we nonetheless believe, for the reasons that follow, that Sun Life cannot be found to have violated ERISA for reaching the decision it did. We first consider the record evidence on which Sun Life relied and then address several particular challenges to the insurer's decision-making.

A. Evidence in the Record

Unquestionably, the most significant evidence in the record is the series of Attending Physician Statements from Dr. French. In each report before the last two, Dr. French opined that Brigham could return to work part-time, with re-training, so long as his job did not require transfers into and out of his car. The next-to-last report, in January 1998, stated that Brigham "possibly" could resume part-time work. Only in the last report - filed after Sun Life notified Brigham that he needed to prove inability to work at any occupation - did Dr. French assert that Brigham was "not at all" capable of working on even a part-time basis. In that same APS, however, Dr. French continued to classify Brigham's physical impairment as Class 4, seemingly indicating his ability to do

sedentary work.[12]  The doctor repeated his earlier assessment that Brigham could sit 5-10 hours and drive 1-3 hours in a normal day and rated him as capable of a wide range of physical movements at least a small percentage of the time.  Each APS throughout the five-year period noted that Brigham's condition remained unchanged from the previous report.

Thus, Dr. French's medical reports did not reflect a decline in Brigham's physical condition from the time he became disabled in 1993.  Despite Sun Life's request for objective medical evidence to substantiate the doctor's assertion in December 1998 that Brigham no longer was capable of the sedentary work the doctor earlier had deemed feasible, no reports of any kind were submitted based on either recent examinations or clinical tests showing progressive loss of abilities.  Dr. Reinert's assessment adds little; he noted that "the gradual decline in physical capabilities which we all experience as we get older, . . . superimposed on the significant disability of being paraplegic," rendered Brigham unable to recover to his level of function before the 1992 muscle strain.  But Dr. French's reports consistently had indicated that Brigham retained at least part-time sedentary employment capabilities after his 1992 injury.  And the TSA identified a number of sedentary jobs that

---

[12] Brigham's argument that Dr. French's "Class 4" evaluation relating to sedentary <u>activity</u> does not signify an ability to do sedentary <u>work</u> is meritless given the employment context and the reference in the "Physical Impairment" section of the APS to the Federal Dictionary of <u>Occupational</u> Titles.

-23-

appeared suitable in that they largely required phone calling or counseling in a single location.[13]

To be sure, the record also contained significant evidence of the daily challenges Brigham faced as a paraplegic with ongoing issues of muscle strain and pain. The affidavits from family and friends emphasized the pain that typically accompanied or followed physical activity, and his own reports described the substantial effort required to accomplish basic daily tasks. We think it beyond question that a return to work would add a substantial burden to Brigham's already difficult life. Yet we cannot say that the insurer was required to conclude, on the medical evidence provided, that that burden rendered him totally disabled, i.e., physically unable to work on even a part-time basis. Nor do we think any reasonable factfinder could reach such a result. See Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st

---

[13] Among the positions noted were: (1) correctional-treatment specialist, essentially a counselor within a prison setting whose primary activity is communication verbally with inmates and others; (2) vocational rehabilitation counselor, in which the primary activities are "verbal interaction with the clients, some computer interface, and telephone contact with clients and others"; and (3) program specialist within an employee assistance program, whose job is to

> coordinate the delivery of services to covered employees, receiving calls from the employees and connecting them with appropriate community services. [Program specialists] then oversee the delivery of services within the parameters of the coverage. The work is entirely sedentary and requires virtually no travel, since most is performed by phone and on computer within a stationary office.

Cir. 2001) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary."); Sullivan v. Raytheon Co., 262 F.3d 41, 52 n.8 (1st Cir. 2001) (same). The insurer's decision to look beyond the subjective conclusions of family and others close to him - and beyond his doctors' unelaborated conclusions – to the specific abilities listed on Dr. French's medical forms was not inevitable, but neither was it arbitrary. That the TSA report offered a number of employment possibilities for an individual with those abilities underscores the reasonableness of Sun Life's decision.

Brigham argues, however, that Sun Life's decision was flawed because it was improper for the insurer to rely on the absence of "objective medical evidence" and because the insurer failed to obtain an independent medical evaluation to counter Dr. French's conclusion of total disability. We turn now to those issues.

B. Objective Medical Evidence

In rejecting Brigham's appeal of its benefits termination decision, Sun Life pointed to the lack of "objective medical support" for the assertion that he is totally disabled from any occupation. Brigham makes a multi-pronged attack on the insurer's reliance on the absence of "objective medical evidence," arguing that the request for such evidence was unnecessary – as Dr. Reinert had opined – in light of his obvious infirmity, and improper

because objective medical evidence was not expressly required by his employee benefit plan. These arguments are unavailing.

We respond to the first argument addressed to the necessity of additional "objective medical evidence" by stressing the particularistic state of this record. In passing, we would note that cases such as these are by nature very fact-oriented. We fully recognize that laboratory tests or similar diagnostic procedures will not always be necessary to substantiate a claim of disability, as certain disabling conditions are not susceptible to such objective evaluations. See, e.g., Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997)("It is now widely recognized in the medical and legal communities that 'there is no "dipstick" laboratory test for chronic fatigue syndrome.'").

Here, however, Dr. French's opinion in the final APS that Brigham was totally disabled for any occupation contradicted his earlier reports, and there was no explanation for his new view, such as evidence of specific physical changes that further limited Brigham's capacity to work. Indeed, Dr. French repeatedly described Brigham's condition as "unchanged." The insurer was therefore justified in seeking some clinical explanation for the doctor's changed perception. Had Brigham's doctors been responsive, for example, to the claims administrator's request of August 24, 1999, to come forward with "any specific measures" and submitted a report of a recent physical examination that revealed

weakening muscle strength, decreasing stamina or other visible indicators of deterioration, Sun Life could not reasonably have relied on earlier medical reports stating that he retained the capacity to perform sedentary work. As claimant, Brigham needed to demonstrate his entitlement to benefits, and he therefore had the burden of substantiating the doctors' new diagnosis that he was incapable of performing fully sedentary work.

Brigham's argument (joined by amici) that the request for "objective medical evidence" imposed an impermissible extra-contractual eligibility criterion was not raised below and is therefore waived. In the district court, Brigham did not contend that Sun Life's request for objective medical evidence was impermissible because it was extra-contractual, but argued instead that he had provided sufficient evidence in support of his claim. In any event, as our prior discussion indicates, the specific record in this case demonstrates that Sun Life was not rejecting Brigham's claim because of failure to satisfy a predetermined prerequisite to eligibility, but was responding to a late-developing and unexplained change of position on the part of Brigham's doctor by seeking non-conclusory medical support for the onset of total disability.

Brigham also accuses Sun Life of changing the evidentiary standard for medical evidence because the same information that he submitted in 1999 had been sufficient when it was submitted in 1995

to prompt reinstatement of his benefits. For two reasons, however, the "inconsistency" does not assist his position. First, the issue had changed from Brigham's ability to do his own job – with the travel requirements – to whether he could do <u>any</u> job. Second, the medical information provided in 1995 – that the muscle strain inevitably would resume with frequent transfers into and out of the car – was linked with information from his employer that multiple transfers would be required. The same medical evidence did not explain why, in 1999, Brigham could not do a job that had no travel requirements. Thus, the record shows that Sun Life did not arbitrarily demand "objective medical evidence" on either occasion, but sought evidence in addition to his doctor's inconsistent or unexplained conclusions. The request for more information was particularly reasonable in 1999 in light of the doctor's prior contrary assessments of his part-time work abilities.

    C. <u>Independent Medical Review</u>

Brigham also suggests that it was improper for Sun Life to reject his own doctors' conclusions without obtaining an independent medical evaluation. Sun Life, however, <u>accepted</u> the limitations identified by Dr. French and adopted Dr. French's earlier judgment that those limitations did not prevent Brigham from all types of work. As Sun Life did not disagree with the claimant's proffered diagnosis, it had no obligation to obtain its own medical evidence. <u>Cf.</u> <u>House</u> v. <u>Paul Revere Life Ins. Co.</u>, 241

F.3d 1045, 1048 (8th Cir. 2001) (insurer that possessed "not even a scintilla of [contrary] evidence" not entitled to discount claimant's doctor's extensive evidence of severe heart disease without conducting independent medical examination). Although the final medical consultant's report was brief, it reflected a review of the materials submitted by Brigham, particularly Dr. French's most recent physician statements. Further medical information would have been illuminating, but it was up to Brigham to explain why Dr. French's quantitative assessments of his physical abilities were no longer an accurate indicator of his ability to work.

## IV. Conclusion

The question we face in this appeal is "not which side we believe is right, but whether [the insurer] had substantial evidentiary grounds for a reasonable decision in its favor." Doyle, 144 F.3d at 184. We share the district court's sentiment that this is a difficult case because of "the obvious courage plaintiff has shown in facing his disability," 183 F. Supp.2d at 438.

Beyond this, it seems counterintuitive that a paraplegic suffering serious muscle strain and pain, severely limited in his bodily functions, would not be deemed totally disabled. Moreover, it seems clear that Sun Life has taken a minimalist view of the record. But it is equally true that the hurdle plaintiff had to surmount, establishing his inability to perform any occupation for

-29-

which he could be trained, was a high one.  As to that issue, we have to agree with the district court that the undisputed facts of record do not permit us to find that Sun Life acted in an arbitrary or capricious manner in terminating appellant Brigham's benefits.

Affirmed.

Concurrence and dissent follows.

**STAHL**, <u>Senior Circuit Judge</u>, **concurring in part and dissenting in part.** I concur in Judge Coffin's opinion that the standard of review in this matter is arbitrary and capricious. Given the facts of this case, however, I have difficulty concluding that Sun Life's actions were not arbitrary and capricious. While the evidence as to the permanence of Brigham's disability is not without some question, there was significant and unrebutted evidence that in his current condition he was unable to work consistently. <u>Cf.</u> <u>Williams</u> v. <u>Int'l Paper Co.</u>, 227 F.3d 706, 712 (6th Cir. 2000) (court held that plan administrator acted arbitrarily and capriciously when it failed to consider relevant evidence of claimant's physical condition). Brigham's life was not that of a malingerer. Affidavits submitted by members of Brigham's family indicated that if he engaged in much activity on one day, he would be in pain or discomfort on subsequent days, making it difficult for him to leave his bed. In short, Brigham hardly seems to be a person capable of sustaining regular employment. Moreover, the Social Security Administration, presumably using the same information, found that Brigham was disabled. <u>See</u> <u>Mitchell</u> v. <u>Eastman Kodak Co.</u>, 113 F.3d 433, 440 (3d Cir. 1997) (in concluding that plan administrator's denial of benefits was arbitrary and capricious, court noted Social Security Administration's determination that claimant could not work). One would think that this finding, coupled with the affidavits from Brigham's family and

the reports from his doctor that he was totally disabled, would have prompted Sun Life to seek an independent examination of Brigham's condition before making the final decision to deny his benefit. Since the standard set forth in the policy -- "satisfactory to us" -- leaves the question of the degree of evidence solely up to Sun Life, I believe its decision to deny benefits in this case was arbitrary and capricious.