# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2409

_____

| | |
|---|---|
| Linda Pralutsky, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Metropolitan Life Insurance | * |
| Company, | * |
| | * |
| Appellant. | * |

_____

No. 04-3239

_____

Appeal from the United States
District Court for the
District of Minnesota.

| | |
|---|---|
| Linda Pralutsky, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Metropolitan Life Insurance | * |
| Company, | * |
| | * |
| Appellant. | * |

_____

Submitted: May 12, 2005
Filed: January 19, 2006

_____

Before WOLLMAN, BYE, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Linda Pralutsky filed an action against Metropolitan Life Insurance Company ("MetLife") under 29 U.S.C. § 1132(a)(1)(B) seeking to enforce a claimed right to benefits under MetLife's long-term disability plan. After both sides moved for summary judgment, the district court granted Pralutsky's motion and ordered MetLife to pay past-due benefits to Pralutsky and to reinstate her in the plan as a participant entitled to benefits. The court also awarded attorneys' fees to Pralutsky. MetLife appeals, and we reverse.

I.

In 2000, Linda Pralutsky was a full-time "health unit coordinator" at the Woodwinds Health Campus, where her duties included clerical and receptionist activities, such as answering phones, greeting visitors, filing, and distributing mail. In January 2001, Pralutsky began suffering from chest pain and leg weakness, and reported seeing spots in front of her eyes. She was hospitalized with these symptoms, but tests performed during her stay did not lead to a diagnosis. Although she reported gradual improvement after leaving the hospital, in July 2001, she began suffering the same symptoms again and was re-admitted for evaluation. Again, no diagnosis was made, but on July 31, 2001, Pralutsky ceased working. She applied to MetLife for long-term disability benefits in November 2001.

In support of her application for disability benefits, Pralutsky was required by MetLife's plan to provide "documented proof of [her] Disability," and "proof" was defined to include the date disability started, the cause of disability, and the prognosis of the disability. (A.R. at 166). To meet this requirement, Pralutsky provided an Attending Physician Statement by her primary care physician, Omar Tveten, M.D.,

-2-

and a supplementary statement by a neurologist, Charles Ormiston, M.D. Both of these documents generally attested to Pralutsky's inability to work: Dr. Ormiston opined that she "simply can't" work, but that he was "hopeful that in 3-4 weeks she'll be better," and Dr. Tveten stated that she was "unable to do duties" and indicated that he had not advised her to return to work. (A.R. at 26, 44). Both documents also reported Pralutsky's subjective complaints of pain. Neither physician provided any lab results, office notes, or other clinical findings with the forms, although both forms requested copies of such materials.

In addition to the supplementary form, Dr. Ormiston wrote a letter to Dr. Tveten, which was provided to MetLife, describing Pralutsky's complaints and examination results. Dr. Ormiston described Pralutsky's pain as starting in her legs, then moving to her arms, or starting in her hips and moving down her legs. He reported that "[s]he is better lying on her back than on her side," that "[i]t is worse at night," and that she "wakes up feeling totally exhausted." (A.R. at 42). On examination, however, Dr. Ormiston reported that her cranial nerves were normal; motor strength, tone, and bulk were normal; reflexes were symmetric; and cerebellar, sensory, station, and gait testing were all normal, except that pain interfered with Pralutsky's ability to walk on her toes and heels. Testing to that point, including a bone scan and abdominal pelvic CT scan, was all negative. Dr. Ormiston opined that the symptoms "seem to fit best in a chronic fatigue or fibromyalgia category," but that he would do an MRI scan "to make sure we are not missing a demyelinating disease or similar problem." (A.R. at 43).

After the MRI, Dr. Ormiston wrote to Dr. Tveten again to inform him that the MRI "showed one demyelinating lesion," which raised suspicions of multiple sclerosis, but that MRI scans of her cervical and thoracic spine were essentially negative. (A.R. at 64). He also noted a thyroid lesion, but left evaluation of that to Dr. Tveten. After a spinal fluid evaluation, Dr. Ormiston wrote to Dr. Tveten a third time and indicated that, with her "completely normal spinal fluid evaluation," he was

of the opinion that Pralutsky did not have multiple sclerosis. He suggested that she might pursue a sleep study or further trials with medication, but believed that because there was no "neurologic abnormality," he had nothing further to offer her as a neurologist. (A.R. at 66).

Pralutsky's claim was also supported by several handwritten notes from Dr. Tveten to MetLife indicating that Pralutsky was disabled and that she had seen specialists but had not yet been definitively diagnosed with a particular illness. Dr. Tveten also reported that Pralutsky suffered from "recurrent pain, migratory in nature" and "feelings of extreme weakness," such that she could not "force herself" any more than two hours out of the day. (A.R. at 37).

In addition to her doctors' opinions, Pralutsky submitted a form that she filled out independently, which reported "weakness, fatigue, pain, [and] severe headache," and stated that she had "about 2 hrs of energy" each day. (A.R. at 57-58). Pralutsky indicated that she was able to do some housework, but that "it might take [her] all day" to dust and vacuum, and that her children helped her run the household. (A.R. at 60). She indicated that she did not have sleeping problems, but also noted that head pain recently had prevented her from sleeping well. In two telephone conversations with representatives from MetLife, Pralutsky repeated her complaints of pain and weakness, and again noted that she needed assistance from her family in household chores. She also indicated that she "takes walks," and that she drove her children to and from school, and cooked when feeling energetic enough. Pralutsky was not using over-the-counter medicine for her pain, was not taking anti-inflammatory drugs, and was not otherwise treating her symptoms.

MetLife's representative advised Pralutsky to seek a referral to a rheumatologist and to consider whether physical therapy or aquatherapy would be appropriate. After its conversations with Pralutsky, MetLife faxed a "Fibromyalgia Initial Functional Assessment Form" to Dr. Ormiston, seeking specific examination information about

symptoms, severity, and treatment. MetLife also inquired about Pralutsky's treatment, whether she had reached her maximum medical improvement, and whether Dr. Ormiston believed she might return to work gradually. Dr. Ormiston did not answer those inquiries or return the assessment form.

After reviewing the information from Pralutsky and her doctors, MetLife denied Pralutsky's claim in a letter dated December 11, 2001. After summarizing the evidence that it had received, MetLife wrote that

> [w]e are unable to substantiate disability so severe to preclude you from returning to your own occupation on a full time basis throughout the elimination period and beyond. Medical documentation does not support severity of diagnosis for fibromyalgia nor does it support you are aggressively treating and under appropriate care for said diagnosis. Therefore, benefits are denied.

(A.R. at 76).

On January 28, 2002, Pralutsky wrote to MetLife indicating that she wished to appeal the denial of benefits, and MetLife responded that "in order to support your claim of disability, we will need treatment records from your treating physicians that indicate your current treating diagnosis, restrictions and limitations, and ongoing current treatment plans." MetLife also added that "your doctor must provide his clinical findings and rationale which supports your claim that you are functionally precluded from performing your own occupation for any employer." (A.R. at 83).

In response to this request for more information, Dr. Tveten submitted another handwritten opinion letter to MetLife, in which he again suggested that Pralutsky was suffering from pain and fatigue that left her "totally disabled." He indicated that the "working diagnosis" was fibromyalgia but that there were "elements of chronic fatigue syndrome," and that anti-depressants and anti-inflammatories had been tried

without success. (A.R. at 86). No other medical information or clinical reports were submitted.

MetLife sought an independent review of Pralutsky's entire file by a physician consultant, Chih-Hao Chou, M.D., Ph.D. Dr. Chou, a board-certified physician in Internal Medicine and Rheumatology, was asked to define Pralutsky's current level of functionality, to address whether her self-reported functional ability was sustained by clinical documentation, and to opine whether her diagnosis was supported by clinical objective findings.

Dr. Chou reviewed Pralutsky's file and responded that "[e]ven though there is no documentation of the typical multiple tender points (more than 11 out of 18 fibromyalgia tender points) the diagnosis of fibromyalgia is supported, based on the description of her symptoms and the exclusion of other diagnoses." (A.R. at 99). But in Dr. Chou's view, this diagnosis was insufficient to show that Pralutsky was totally disabled. Dr. Chou opined that she had only a "mild impairment," and that the record did not contain "any objective medical findings to support more significant impairment." (A.R. at 100). Therefore, Dr. Chou believed that Pralutsky should still be able to perform her current sedentary work. In addition, Dr. Chou noted that she was receiving "appropriate and regular" medical care, but that she "has not exhausted all of her treatment options and she has not reached maximum medical improvement." (*Id.*).

In a letter dated April 11, 2002, MetLife informed Pralutsky that after review, it was upholding the previous denial of benefits. MetLife said that Pralutsky had "self reported significant functional inability to work," but that this was "without substantiation from the medical records." (A.R. at 103). Aside from her self-reported complaints, MetLife found there were "essentially no objective medical findings to support the pathology in the musculosketal [sic] or neurological systems." (*Id.*).

-6-

Pralutsky then filed the instant action, alleging that MetLife breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA").[1] The district court found that MetLife had committed an "egregious" procedural irregularity in denying benefits to Pralutsky, and therefore reviewed the denial of benefits without the deference normally accorded to a plan administrator. The court concluded that "substantial evidence bordering on a preponderance" – the heightened review standard it applied – did not support the denial of benefits, and ordered MetLife to pay benefits, including past-due benefits and prejudgment interest. After a motion by Pralutsky, the court also awarded attorneys' fees and costs to Pralutsky in the amount of $14,179.11.

II.

Under ERISA, a plan participant may bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Where the plan reserves discretionary authority to the plan administrator, we apply a deferential standard of review, considering whether the administrator abused its discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 2005) (en banc). We have said that this deferential standard is not applicable, however, if the claimant demonstrates that "a serious procedural irregularity existed" and caused a "serious breach" of the plan administrator's fiduciary duty to the claimant. *Buttram v. Cent. States, S.E. & S.W. Areas Health & Welfare Fund*, 76 F.3d 896, 899-900 (8th Cir. 1996). We review *de novo* the district court's decision to grant summary judgment.

---

[1]Pralutsky also initially alleged that MetLife's denial of benefits was a breach of contract. This state law claim was dismissed with prejudice by the district court, and Pralutsky does not appeal the dismissal of this claim. *See Pralutsky v. Metro. Life Ins. Co.,* 316 F. Supp. 2d 840, 842 n.1 (D. Minn. 2004).

Pralutsky argues that MetLife committed a "serious procedural irregularity" in her case by insisting that she provide objective evidence of her disability. According to Pralutsky, this requirement was not justified by the plan's terms, and therefore indicates that the administrator's decision was arbitrary and not entitled to deference. The district court agreed, and required instead that the record contain "substantial evidence bordering on a preponderance" to support the denial of benefits. *Pralutsky*, 316 F. Supp. 2d at 851.

We disagree that MetLife's reliance on the absence of objective evidence for its denial of benefits constitutes a "serious procedural irregularity" that justifies abandoning the deference normally accorded an administrator's decision under ERISA. When we introduced this concept, we explained that under the common law of trusts, which is our guide in reviewing the benefits determinations of ERISA plan trustees, heightened scrutiny may apply "where the plan trustee labors under a conflict of interest, or where, in the exercise of his power, he acts dishonestly, or from an improper motive, or he fails to use judgment in reaching his decision." *Buttram*, 76 F.3d at 900 (internal citations omitted). When we speak of "procedural irregularity" in this context, therefore, we refer to the sorts of external factors that are sufficient under the common law of trusts to call for application of a less deferential standard of review. Before such heightened review applies, the claimant "must show (1) that a serious procedural irregularity existed, which (2) caused a serious breach of the plan trustee's fiduciary duty to the plan beneficiary." *Id*.

While the parties hotly contest whether the administrator's decision in this case was reasonable, we are not persuaded that the decision was made without reflection or judgment, such that it was "the product of an arbitrary decision or the plan administrator's whim." *Buttram,* 76 F.3d at 900; Restatement (Second) of Trusts § 187 cmt. h (1959). This is not a case where the plan trustee failed to inquire into the relevant circumstances at issue, or never offered a written decision that can be reviewed, or committed irregularities so severe that the court "has a total lack of faith

in the integrity of the decision making process." *Buttram,* 76 F.3d at 900. What we have here is a dispute over whether the administrator reasonably interpreted the plan to require objective medical evidence to prove the claimant's disability, and whether the record supports the administrator's exercise of judgment that benefits should be denied based on the evidence that was presented. The administrator's decision – whether right or wrong, reasonable or unreasonable – was not made "without knowledge of or inquiry into the relevant circumstances and merely as a result of [its] arbitrary decision or whim." Restatement (Second) of Trusts § 187 cmt. h. The normal standard of review is thus appropriate.

Under that standard, we consider whether the administrator abused its discretion – that is, whether its interpretation of the plan was reasonable, and whether its decision was supported by substantial evidence. *King*, 414 F.3d at 999. We have said that in some circumstances a plan administrator's insistence on objective medical evidence can be unreasonable. In *House v. Paul Revere Life Insurance Co.*, 241 F.3d 1045 (8th Cir. 2001), we concluded that it was an abuse of discretion for a plan administrator to insist on "objective medical evidence" of heart disease, where the plan documents advised only that the administrator "may require medical exams or written proof of *financial* loss," and stipulated that if a medical exam was required, the administrator would pay for it. *Id.* at 1048 (emphasis added). There may be other cases in which objective evidence simply cannot be obtained, and it would be unreasonable for an administrator to demand the impossible. *See Brigham v. Sun Life of Can.*, 317 F.3d 72, 84 (1st Cir. 2003). And it may well be unreasonable for an administrator to expect a claimant to provide "objective evidence" if the administrator does not provide an adequate explanation of the information sought.

We have held elsewhere, however, that "[i]t is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence," *McGee v. Reliance Standard Life Insurance Co.*, 360 F.3d 921, 924-25 (8th Cir. 2004), and *House* does not state a universal rule that an administrator is precluded from insisting

on objective medical evidence when it is appropriate under the terms of a plan and the circumstances of the case. *See also Hunt v. Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005) (per curiam) (upholding a denial of benefits where objective medical evidence did not support claimed disability from restless leg syndrome and related problems); *Coker v. Metro. Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002) (finding denial of benefits not unreasonable where objective medical evidence did not support claimant's contention that he was disabled by diabetes and syncopal episodes). The plan in this case states that the claimant must provide, at her own expense, "documented proof of [her] Disability," and that if the claimant does not provide "satisfactory documentation within 60 days after the date we ask for it," the claim may be denied. (A.R. at 166-67). The plan does not define what sort of "proof" or "documentation" is sufficient to establish a disability, and the administrator is entitled to define those ambiguous terms as long as its interpretation is reasonable. *See King*, 414 F.3d at 999; *Finley v. Special Agents Mut. Benefit Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992). In view of our precedent affirming the reasonableness of a plan administrator denying benefits based on a lack of objective evidence, we cannot say, as a general matter, that it is unreasonable for MetLife to interpret the plan to require provision of objective evidence as part of the "proof" and "documentation" that a claimant must submit.

Having examined the circumstances of this particular case, we also believe it was reasonable on the facts presented here for MetLife to request clinical and objective evidence, and to deny the claim when Pralutsky failed to provide it. MetLife's communications with Pralutsky support its contention that it was requesting only substantiation of the extent of Pralutsky's disability and not an impossible level of objective proof that she suffered from fibromyalgia. In its initial denial letter, MetLife did not deny Pralutsky's diagnosis, but cited its inability to substantiate "disability so severe to preclude you from returning to your own occupation," and added that "documentation does not support severity of diagnosis for fibromyalgia." (A.R. at 76). MetLife's final denial letter repeated the first letter's statement that

medical information did not support "severity of diagnosis," and added that Pralutsky's "significant functional ability to work" was "without substantiation in the medical records." (A.R. at 103). The letter also referred to the absence of "objective medical findings to support the pathology in the musculoske[le]tal or neurological systems," but this was in reference to whether Pralutsky had a "significant functional inability to work," not whether she suffered from fibromyalgia at all.

MetLife's independent physician consultant, Dr. Chou, likewise confirmed the diagnosis of fibromyalgia, but concluded that "[b]ased on the limited medical information regarding the physical examinations, it would be expected that Ms. Pralutsky is able to perform at least sedentary type of work." (A.R. at 100). He concluded: "The subjective pain and fatigue are consistent with fibromyalgia; however, there is no objective abnormal finding to suggest any deficit or pathology in the neurological or musculoskeletal system *that would preclude her from performing any type of occupation.*" (A.R. at 100) (emphasis added). Pralutsky herself acknowledges that "[t]he impact that [fibromyalgia syndrome] has on daily living activities, including the ability to work a full-time job, differs among patients." (Br. of Appellee at 28) (quoting "Fibromyalgia Network"). Given this potential for varying impact of the condition among different patients, MetLife was requesting objective information to verify that this claimant, whom it acknowledged was afflicted with fibromyalgia, was disabled to the point that she could not perform even sedentary or light-duty work.

This is not a case in which MetLife unreasonably expected Pralutsky to guess what evidence would satisfy the plan administrator. MetLife specifically identified and requested additional clinical evidence supporting the severity of Pralutsky's condition. Immediately after she applied for benefits, MetLife wrote a letter describing the information that it required to complete her application, including "treatment records from July 2000 to present" and test results, medication records, and a treatment plan. (A.R. at 65). MetLife directly provided the Fibromyalgia Initial

Functional Assessment Form to Dr. Ormiston and sent a fax to both Dr. Tveten and Dr. Ormiston requesting office records from initial evaluation to the present, and information about her current restrictions, prognosis, course of treatment, whether Pralutsky had reached her maximum medical improvement, and whether the doctors would suggest a graduated return to work then or in the future. (A.R. at 56, 72). The nature of the evidence MetLife was seeking was brought to Pralutsky's attention later in the application process as well. In its response to her appeal letter, MetLife indicated that she should provide "treatment records from [her] treating physicians that indicate [her] current treating diagnosis, restrictions and limitations, and ongoing current treatment plans" and "clinical findings and rationale" to support her disability claim. (A.R. at 83).

Reviewing the record as a whole, we conclude that a reasonable person could have reached the same decision as the plan administrator. The administrator had conflicting opinions from Pralutsky's physicians and its independent physician consultant regarding the extent of Pralutsky's limitations, and Pralutsky failed to provide the requested objective evidence that might have established her inability to work. Although Dr. Tveten opined that Pralutsky was disabled, he did not provide his clinical notes or answer specific questions about his assessment of her prognosis and current functional abilities. Dr. Ormiston similarly declined to return forms that would have indicated more specifically the nature and severity of Pralutsky's limitations. Pralutsky's counsel suggested at oral argument that MetLife itself could have completed a one- or three-day assessment of her residual functional capacity if MetLife wanted to gather more objective evidence about the severity of her condition, but we see no reason why Pralutsky could not have done the same thing herself in response to MetLife's requests for objective evidence. Her suggestion that an RFC assessment would have been useful indicates that it was not impossible to provide objective evidence in support of her claim.

If any one of MetLife's multiple requests for more information had resulted in the submission of office records, or the fibromyalgia assessment form requested by MetLife, or detailed current information about treatment, prognosis, or residual functional capacity, then our analysis may well be different. But in this situation, the evidence before the administrator was limited to letters from two doctors largely repeating Pralutsky's subjective complaints, a normal abdominal and pelvic CT scan, a two-page attending physician statement and one-page supplement, and a general assessment form that Pralutsky completed herself. When MetLife repeated its request for objective and clinical evidence for consideration of Pralutsky's appeal, the only response it received was a letter from Dr. Tveten repeating Pralutsky's subjective complaints of pain and fatigue. In view of the plan administrator's obligation to protect the plan's trust property by ensuring that disability claims are substantiated, it was not unreasonable for the administrator to require clinical documentation of the sort requested here, and to conclude that Pralutsky had failed to prove that she was disabled under the plan. *See Boardman v. Prudential Life Ins. Co.*, 337 F.3d 9, 16-17 (1st Cir. 2003).

Because we hold that the district court's grant of summary judgment was in error, we also conclude that Pralutsky was not entitled to attorneys' fees and costs under 29 U.S.C. § 1132(g)(1). *See Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 890 (8th Cir. 2002).

\* \* \*

The district court's judgments are reversed, and the case is remanded for entry of judgment in favor of the defendant.

-13-

BYE, Circuit Judge, dissenting.

While I agree MetLife did not commit a serious procedural irregularity, I would nevertheless affirm the district under the abuse-of-discretion standard typically applied in ERISA cases. I therefore respectfully dissent.

MetLife abused its discretion when it denied Pralutsky's claim based on a lack of objective evidence she *could not* work, because the record also lacks objective evidence she *could* work. In House v. The Paul Revere Life Ins. Co., 241 F.3d 1045 (8th Cir. 2000), the administrator denied long-term disability benefits after citing the treating physician's failure to provide "any objective medical findings [or] test data" to support a claim of total disability. 241 F.3d at 1047. We determined the administrator abused its discretion because there was "not even a scintilla of evidence refuting the extensive documentation of House's severe heart disease supplied by the specialist who had treated House for a decade." Id. at 1048. Like in House, there is no evidence in this record showing Pralutsky could work. Although the independent review performed by Dr. Chou concluded Pralutsky could function adequately to perform her job, Dr. Chou made that finding solely because of the lack of objective evidence in the record to support the severity of Pralutsky's fibromyalgia diagnosis. See A.R. at 100 ("Based on the diagnosis of possible fibromyalgia with significant subjective pain and fatigue, Ms. Pralutsky has a mild impairment. The medical records do not provide any objective medical findings to support more significant impairment."). Dr. Chou did not refer to any other evidence to refute the opinions of Pralutsky's treating physicians.

The majority distinguishes House by citing three cases, McGee v. Reliance Standard Life Insurance Co., 360 F.3d 921 (8th Cir. 2004), Hunt v. Metropolitan Life Insurance Co., 425 F.3d 489 (8th Cir. 2005), and Coker v. Metropolitan Life Insurance Co., 281 F.3d 793 (8th Cir. 2002). McGee turned on the combination of the lack of objective evidence *and* the fact McGee's treating psychiatrist and psychologist

changed their diagnoses without explanation. See McGee, 360 F.3d at 923, 924-25 (emphasizing the inconsistent nature of the treating physicians' medical records). Coker represents a case in which the claimant's subjective complaints were contradicted by or inconsistent with other record evidence. See Coker, 281 F.3d at 798-99 (noting the record showed Coker had not fainted or experienced a blackout – conditions which allegedly prevented him from working – in several months and concluding "reasonable physicians could disagree on the extent of Coker's disability"). Finally, I dissented in Hunt for the same reason I am dissenting here, because the plan administrator "abused its discretion in denying benefits based solely on absence of any objective evidence [where] the claimant's subjective complaints are not contradicted by or inconsistent with other record evidence." See Hunt, 425 F.3d at 492 (Bye, J., dissenting).

> [F]ibromyalgia [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia.

Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 916 (7th Cir. 2003) (quoting Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir.1996)). "Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia." Jordan v. Northrup Gumman Corp. Welfare Benefit Plan, 370 F.3d 869, 872 (9th Cir. 2003). In my view, MetLife places too much emphasis on the lack of objective evidence where the issue is the severity of a disability caused by fibromyalgia. In such a case, I believe the plan needs more to deny a claim than a reviewing physician's opinion based solely upon a lack of objective evidence.

I respectfully dissent.

_____