**Linda PRALUTSKY, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**No. CIV. 03–4389RHK/AJB.**

United States District Court,
D. Minnesota.

May 3, 2004.

William J. Marshall, Babcock, Neilson, Mannella, LaFleur & Klint, Anoka, Minnesota, for Plaintiff.

Doreen A. Mohs, Rider Bennett, LLP, Minneapolis, Minnesota, for Defendant.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Like chronic fatigue syndrome, fibromyalgia "pose[s] significant problems for disability plan administrators." *Wilkins v. Hartford Life and Acc. Ins. Co.*, 299 F.3d 945, 947 (8th Cir.2002). After Metropolitan Life Insurance Company ("MetLife")

denied Linda Pralutsky's claim for fibromyalgia-related disability, Pralutsky filed suit alleging that MetLife breached its fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"). Each side has now moved for summary judgment. For the reasons set forth below, the Court will grant Pralutsky's motion and deny MetLife's motion with regard to the ERISA claim.[1]

## Background

### I. Introduction

Fibromyalgia is "a type of muscular or soft-tissue rheumatism that affects principally muscles and their attachment to bones." *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Tech. Inc.*, 125 F.3d 794, 796 (9th Cir.1997). Also known as fibrositis, fibromyalgia is

a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia.

*Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir.1996).

People with fibromyalgia have generalized pain, achiness, and stiffness all over their bodies.... The other main characteristic of fibromyalgia is chronic fatigue, probably related to disturbed sleep patterns. Sufferers often complain of waking up as tired as they were when they went to sleep, having continued fatigue throughout the day.

*Morgan v. UNUM Life Ins. Co.*, 2002 WL 31095391 at *1 n. 1 (D.Minn. Sept.16, 2002) (Davis, J.) (quoting Simeon Margolis, M.D., Ph.D. & John A Flynn, M.D., *The Johns Hopkins White Papers* 89 (1995)). "It is often difficult to diagnose fibromyalgia, and '[o]ften people with fibromyalgia have undergone many tests and have seen many different specialists while in search of an answer.'" *Lang*, 125 F.3d at 796 (quoting "Fibromyalgia," *Arthritis Foundation Pamphlet* at 7 (1992)).

### II. Pralutsky's Disability Claim

From 2000 to 2001, Pralutsky worked as a health unit coordinator at the Woodwinds Health Campus. (Mohs Aff. Ex. A at AR 62, 90.) Her duties included "[g]reeting and assisting visitors" and "carrying out all unit/clerical and receptionist activities (i.e., answering phones, filing, maintaining bulletin boards, distributing mail, etc.)" in the cardiopulmonary department. (*Id.* at AR 90.) She was paid $13.50 an hour and worked a 40–hour week. (*Id.* at AR 4.)

While at work in January 2001, Pralutsky felt pains in her chest and saw black spots in front of her eyes. (*Id.* at AR 42.) She was admitted to the intensive care unit at Woodwinds. (*Id.* at AR 42, 24.) Medical evaluations, however, came back negative, and she was released after four days. (*Id.* at AR 42, 7.) On July 31, 2001, Pralutsky began suffering these symptoms again and was readmitted for three days. (*Id.*)

Following the second hospitalization, Dr. Omar Tveten, Pralutsky's primary care physician, found that "weakness & pain" resulting from an as-yet undiagnosed ill-

---

1. Pralutsky has also alleged breach of contract under state law. As Pralutsky tacitly now acknowledges, however, that claim is clearly preempted by ERISA. *See, e.g., Kuhl v. Lincoln Nat'l Health Plan*, 999 F.2d 298, 302–02 (8th Cir.1993); *see also* 29 U.S.C. § 1144(a) (specifically preempting state laws that "relate to ... any employee benefit plan"). The Court will therefore grant MetLife's motion to dismiss the breach of contract claim.

ness rendered her "unable to do [her] duties" at Woodwinds. (*Id.* at AR 024.) He submitted a disability claim form to MetLife, Pralutsky's disability insurance provider. (*Id.*) He also sent the following note:

Linda Pralutsky has been, and continues to be, disabled since July 31, 2001. She has seen a number of specialists, but as yet there has been no definitive diagnosis but her condition is such that she is unable to work.

(*Id.* at AR 33.) He submitted a similar note the following week, reiterating that Pralutsky's inability to work stemmed from "recurrent pain, migratory in nature, and feelings of extreme weakness." (*Id.* at AR 37.) Dr. Tveten noted that although "[s]he starts the day with enthusiasm," after two hours she could not "force herself" any longer. (*Id.*) "She has seen a number of consultants but as of this moment no definitive diagnosis has been made." (*Id.*)

On October 9, 2001, Pralusky saw Dr. Charles Ormiston, a neurologist to whom she had been referred by Dr. Tveten. (*Id.* at AR 42.) Dr. Ormiston also noted her substantial pain and fatigue:

The pain is first in the legs and as that settles then she might get some pain in her arms as well and then will feel totally exhausted. She is better lying on her back than on her side. The pain seems to start in her hips and work down her legs. It is worse at night. There are times when she wakes up feeling totally exhausted. Other times when she can have a few hours feeling [okay] before this comes on. No days without for a long time now.

(*Id.*) After performing an examination and reviewing the results of her cat scan, Dr. Omiston concluded that she "best fit in a chronic fatigue or fibromyalgia category." (*Id.* at AR 43.) He submitted a disability form for MetLife, filling in the diagnosis

code for fibromyalgia and noting her "severe fatigability and lower ext[remity] pain." (*Id.* at AR 44.) After seeing Pralutsky several more times over the next month—and ruling out multiple sclerosis—Dr. Omiston confirmed the diagnosis of fibromyalgia, although he still "could not be sure that there is not an element of chronic fatigue syndrome." (*Id.* at AR 66.)

On December 11, 2001, MetLife denied Pralutsky's claim for disability benefits. (*Id.* at AR 75–76.) In the denial letter, the Plan Administrator reviewed Pralutsky's recent medical history and noted her "subjective reports of chest pain, dizziness and weakness in arms and legs." (*Id.*) The Plan Administrator noted that Dr. Tveten had "indicated [her] inability to work" due to those symptoms, and that "Dr. Ormiston felt you fit best into the category of fibromyalgia diagnosis." (*Id.*) Nevertheless, the Plan Administrator found that benefits must be denied. (*Id.*)

We are unable to substantiate disability so severe to preclude you from returning to your own occupation on a full time basis throughout the elimination period and beyond. Medical documentation does not support severity of diagnosis for fibromyalgia nor does it support that you are aggressively treating and under appropriate care for said diagnosis. Therefore, benefits are denied.

(*Id.*) The letter closes by informing Pralutsky of her rights to appeal and submit additional medical and vocational information. (*Id.*)

On January 28, 2002, Pralutsky filed her notice of appeal. (*Id.* at AR 82.) She submitted her job description, as well as another letter from Dr. Tveten. (*Id.* at AR 89, 86.) That letter reads, in pertinent part,

Linda continues to be totally disabled. Presently, the working diagnosis is fibromyalgia but there are elements of

chronic fatigue syndrome as well. There are days she has so much pain it is difficult to even get out of bed. On a good day, she may function for 2 hrs but then becomes utterly fatigued & has to lie down. For someone who in the past has held down 2 full time jobs, this condition is extremely frustrating. [Her] neurologist, C. Ormiston, agrees there are very poor treatments for this condition. Antidepressants have been tried but [with a] poor response. Anti-inflammatories have been tried but [with a] poor response. It is hoped that time will lessen her symptoms but as of this time she remains totally disabled.

(*Id.* at AR 86.)

On appeal, MetLife submitted Pralutsky's file to "Elite Physicians," a division of Network Medical Review Co., Ltd. (*Id.* at AR 98.) "Elite Physicians" describes itself as a "Provider[ ] of Evidence–Based Medical Reports." (*Id.*) MetLife asked the reviewing physician to define Pralutsky's current level of functionality. (*Id.* at AR 93.) In addition, MetLife posed two specific questions: (1) "Is the employee's self reported functional ability substantiated by the cl[ ]inical documentation," and (2) "Is the claimant's diagnosis supported by clinical objective findings?" (*Id.*)

Pralutsky's claim was reviewed by Dr. Chih–Hao Chou, a board-certified internist and rheumatologist. (*Id.* at AR 101.) After reviewing Pralutsky's medical history, Dr. Chou provided his analysis:

The history of generalized pain from the legs to the arms and the associated symptoms of fatigue, insomnia, and depression, is consistent with the diagnosis of fibromyalgia. Ms. Pralutsky has undergone an extensive work-up and no definite pathology or abnormality was found to explain her symptom complex. Even though there is no documentation of the typical multiple tender points (more than 11 out of 18 fibromyalgia

tender points), the diagnosis of fibromyalgia is supported, based on the description of her symptoms.

(*Id.* at AR 99.) While Dr. Chou concluded that the diagnosis of chronic fatigue syndrome was not supported, he did find that Pralutsky was receiving "appropriate and regular medical care at this time." (*Id.* at AR 100.)

Dr. Chou acknowledged Pralutsky's "significant subjective pain and fatigue." (*Id.*) He found, however, that her impairment was "mild" based on the absence of any "objective medical findings to support a more significant impairment." (*Id.*) He concluded that Pralutsky could therefore perform sedentary work. (*Id.*) "The subjective pain and fatigue are consistent with fibromyalgia; however, there is no objective abnormal finding . . . to preclude her from performing any type of occupation." (*Id.*)

On April 11, 2002, MetLife affirmed its denial of Pralutsky's disability benefits. The plan administrator explained his rationale:

Upon completion of a thorough file review of all medical evidence in your claim file, it has been summarized that you have self reported significant functional inability to work secondary to your pain and fatigue. This is without substan[t]iation from the medical records. B[e]sides self reported complaints, the[r]e [are] essentially no objective medical findings to support the pathology in the musculoske[le]tal or neurological systems. As your Own Occupation[ ] falls . within the sedentary type of work, you are able to perform your current work.

(*Id.*) According to the letter, MetLife's original decision to deny benefits was "appropriate, and remains the same." (*Id.*)

On July 7, 2003, Pralutsky filed suit.

### III. The Disability Plan

Under the MetLife plan in which Pralutsky was a participant ("the Plan"), disability is defined as follows:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1. During the first 24 months, including your Elimination Period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or

2. after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings

(*Id.* at AR 155–156.) The "Elimination Period" is 90 days of continuous disability. (AR 151.)

To qualify as disabled, the claimant must have been receiving "appropriate care and treatment." (*Id.* at AR 155 (capitalization omitted).) Under the Plan, appropriate care and treatment is medical care that meets the following criteria:

1. it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;

2. it is necessary to meet your basic health needs and is of demonstrable medical value;

3. it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;

4. it is consistent with the diagnosis of your condition; and

5. its purpose is maximizing your medical improvement.

(*Id.* at AR 156.)

The Plan also requires that claimants provide "documented proof of ... Disability." (*Id.* at AR 166.) Proof "includes, but is not limited to,"

1. the date your Disability started;

2. the cause of your Disability; and

3. the prognosis of your Disability.

(*Id.* at AR 166–67.) In addition, claimants are "required to provide signed authorization for us to obtain and release medical and financial information, and any other items we may reasonably require in support of [the] Disability." (*Id.* at AR 167.)

Finally, the Plan provides MetLife with the discretionary authority to determine benefits:

In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(*Id.* at AR 174.)

### Standard of Decision

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.,* 224 F.3d 735, 738 (8th Cir.2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. *See Graves v. Arkansas Dep't of Fin. & Admin.,* 229 F.3d 721, 723 (8th Cir.2000); *Calvit v. Minneapolis Pub. Schs.,* 122 F.3d 1112, 1116 (8th Cir.1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995).

### Analysis

### *I. ERISA Standard of Review*

■ An ERISA plan participant may bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Where, as here, a plan gives the administrator "discretionary authority to determine eligibility for benefits," the Court generally reviews the administrator's decision for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). This deferential standard stems from courts' hesitancy to interfere with the administration of benefits plans. *Layes v. Mead Corp.,* 132 F.3d 1246, 1250 (8th Cir.1998). Courts will, however, apply a less deferential standard of review to a plan administrator's decision when a plaintiff presents "material, probative evidence demonstrating that (1) a pal-

pable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998).

Pralutsky contends that MetLife committed a serious procedural irregularity by refusing to consider the subjective evidence she submitted as legally sufficient evidence of disability. MetLife asserts that it was entirely proper for the Plan Administrator to deny Pralutsky's claim based on a lack of objective evidence. This poses a threshold question for the Court. If it was proper for MetLife to require Pralutsky to submit objective medical evidence, then it correctly processed her claim and the appropriate standard of review is abuse of discretion. If, however, MetLife was not entitled to deny her claim based on a lack of objective evidence, then it applied an arbitrary standard to her submissions. Because failing to credit her subjective evidence would constitute a serious procedural irregularity, a less deferential standard would be appropriate.

### A. Subjective and Objective Medical Evidence

To determine whether MetLife could properly deny Pralutsky's claim based on a lack of objective evidence, the Court must first answer two questions. First, whether, as MetLife suggests, it was reasonable as a matter of law for the Plan Administrator to require such evidence. Second, if the requirement was not per se reasonable, whether the Plan Administrator was nonetheless entitled to do so under the terms of the Plan.

### 1. Per Se Reasonable

■ MetLife argues that "[i]t is not unreasonable for administrators to base disability decisions on the presence or ab-

sence of objective evidence." (Def.'s Mem. in Supp. Summ. J. at 17.) For this proposition, MetLife cites the Eighth Circuit's recent holding in *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921 (8th Cir. 2004). *McGee*, however, is not the Eighth Circuit's only utterance on this subject in the ERISA context, and it is worth taking a detailed look at these recent holdings to determine whether the Eighth Circuit has established a blanket rule on objective medical evidence in ERISA cases.[2]

The Eighth Circuit first grappled authoritatively with subjective-versus-objective medical evidence in ERISA cases in *House v. Paul Revere Life Insurance Co.*, 241 F.3d 1045 (8th Cir.2001). In *House*, the defendant insurer denied plaintiff's long-term disability benefits on the ground that plaintiff had failed to provide "any objective medical findings [or] test data" to support his disability claim. *Id.* at 1047. In reversing the district court's grant of summary judgment for the insurer, the court applied an abuse-of-discretion standard and held that the plaintiff's documentation was sufficient. In so holding, the court stated:

> even if the exhaustive supporting documents [the doctor] submitted could be dismissed as subjective, nothing in the terms of the plan support[s] [the insurer's] demand for "objective medical evidence."

*Id.* at 1048. *House* thus directs the Court to consult the plan itself to determine whether and under what circumstances a plan administrator may require objective medical evidence.

The Eighth Circuit dealt again with subjective medical evidence in *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835 (8th Cir.2001). The insured sued after the plan administrator denied a work-related stress claim on the ground that "[p]erceived stress is a subjective and unquantifiable factor which cannot be correlated with any objective evidence." *Id.* at 838. In overturning this decision, the court, applying de novo review, noted:

> In its notice terminating benefits, [the insurer] explained that "stress is a subjective and unquantifiable factor which cannot be correlated" with the objective medical evidence needed to establish total disability. But an inability to cope with stress can disable a person from performing his or her regular occupation, even if the person can still perform other work..... Thus, that [plaintiff's] disability is stress-related does not preclude him from recovering plan benefits.

*Id.* at 841.

More ambiguous with regard to subjective and objective medical evidence is the Eighth Circuit's holding in *Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793 (8th Cir.2002). In *Coker*, the plan administrator denied a claim for long-term disability based on complications relating to diabetes. Applying an abuse-of-discretion standard, the court affirmed the district court's decision granting summary judgment in favor of the insurer.

> Upon review of the records submitted by all three physicians, MetLife rejected Coker's disability claim as unsupported by objective medical evidence. Although reasonable physicians could disagree on the extent of Coker's disability, MetLife's denial of benefits is not unreasonable. Under the deferential review accorded to a plan administrator's denial

---

2. Each of the cases discussed below is a panel decision; the Eighth Circuit has not taken the question of objective medical evidence en banc. While the en banc court may overrule a previous panel decision, one panel of the Eighth Circuit is not at liberty to overrule another. *See, e.g., Kostelec v. State Farm Fire & Cas. Co.*, 64 F.3d 1220, 1228 n. 8 (8th Cir.1995).

of benefits, a reasonable conclusion by MetLife provides us with a sufficient basis to affirm the district court's grant of summary judgment.

*Id.* at 799. This language makes no mention of the plan language in justifying the demand for objective medical evidence. However, it also does not explicitly set forth a blanket rule regarding such evidence.[3] *Coker* cites neither *House* nor *Walke.*

Finally, the Eighth Circuit most recently dealt with objective medical evidence in *McGee,* 360 F.3d 921. McGee filed a claim for long-term disability benefits based on "major affective disorder, anxiety, and various physical pains." *Id.* at 923. The claim was denied. *Id.* at 924. In reversing the district court's grant of summary judgment for the plaintiff, the court applied an abuse-of-discretion standard and held that absence of objective evidence provided a sufficient basis for the denial. The court stated:

We hold that the company's decision was based on substantial evidence. The

medical records of [the psychologist] and [the primary care physician] were inconsistent, and neither provided reliable objective evidence of testing or other proof to support the finding of a long-term disability. It is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence. *Coker v. Metro. Life Ins. Co.,* 281 F.3d 793, 799 (8th Cir.2002).

*Id.* at 924–25. In so holding, the court read *Coker* for the proposition that plan administrators may reasonably deny benefits based on a lack of objective evidence. Like *Coker, McGee* cites neither *House* nor *Walke.*[4]

█ Examining these cases together, it is clear that the Eighth Circuit takes no single approach to subjective and objective evidence in the context of ERISA. Rather, the court appears to engage in a case-specific analysis with regard to the particular claims and policy language before it. In practice, its approach is not unlike that of the First Circuit, which has noted with regard to objective medical evidence:

---

3. Six months after *Coker,* the Eighth Circuit dealt with the denial of a chronic fatigue syndrome claim in *Wilkins v. Hartford Life and Acc. Ins. Co.,* 299 F.3d 945 (8th Cir.2002). While deciding that the claim was time-barred, the court noted in dicta that the claim was analogous to one resolved five years earlier by the Third Circuit: "The record in this case is not unlike that in *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 441–43 (3d Cir. 1997), where the Third Circuit concluded an ERISA plan administrator abused its discretion in denying benefits. Here, the reasons given by Hartford personnel for denying the claim are much like the reasons criticized by the court in *Mitchell,* primarily the lack of 'objective medical evidence' of CFS." *Id.* at 947 n. 1; *see also Mitchell,* 113 F.3d at 442 ("Because the disease, although universally recognized as a severe disability, has no known etiology, it would defeat the legitimate expectations of plan participants in the Kodak Plan to require those with CFS to make a

showing of clinical evidence of such etiology" (internal citation and quotation omitted).).

4. One month prior to *McGee,* the Eighth Circuit issued an unpublished opinion taking the opposite approach. *See Collins v. Continental Cas. Co.,* 87 Fed.Appx. 605 (8th Cir.2004); *see also* 8th Cir. Rule 28A(i) (allowing for the citation of unpublished opinions "if the opinion has persuasive value on a material issue and no published opinion of this or another court would serve as well."). Again applying a deferential standard, the court held that it was an abuse of discretion for the plan administrator to ignore the claimant's self-reported symptoms of chronic and disabling pain. "[I]t appears the plan administrator simply refused to consider her subjective complaints as legally sufficient evidence. However, *a plan administrator may not deny benefits simply because the only evidence of a disabling condition is subjective evidence.*" *Collins,* 87 Fed.Appx. at 607 (emphasis added).

[C]ases such as these are by nature very fact-oriented. We fully recognize that laboratory tests or similar diagnostic procedures will not always be necessary to substantiate a claim of disability, as certain disabling conditions are not susceptible to such objective evaluations. *Brigham v. Sun Life of Canada,* 317 F.3d 72, 84 (1st Cir.2003). While *McGee* cites *Coker* for the proposition that plan administrators may reasonably require the claimant to submit objective evidence, it does not state that plan administrators may always do so. Indeed, if *Coker* and *McGee* so held, they would directly conflict with *House* and *Walke.* In this Court's view, however, no such conflict exists; the Eighth Circuit has not established a per se rule regarding objective medical evidence in ERISA cases, but rather a consistent, fact-specific approach.[5]

## 2. The Terms of the Plan

 In the absence of a blanket rule, however, the Plan Administrator may still require objective medical evidence if permitted by the terms of the Plan. *House,* 241 F.3d at 1048. An ERISA plan is a "creature[ ] of contract law," *Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan,* 713 F.2d 247, 252 (7th Cir.1983), and as long as its provisions are consistent with the governing statute, the rights and responsibilities of each party are bounded by the terms of the agreement. In that spirit, the Court examines the language of the Plan using "ordinary rules of construction." *DeGeare v. Alpha Portland Indus.,* 837 F.2d 812, 816 (8th Cir.1988). The Court accords plainly stated terms "their ordinary, and not specialized, meanings." *Brewer v. Lincoln Nat'l Life Ins. Co.,* 921 F.2d 150, 154 (8th Cir.1990).

The Plan provides two plausible bases for requiring objective medical evidence. The first is the Plan provision requiring "documented proof of ... Disability." (Mohs Aff. Ex. A at AR 166.) This proof "includes, but is not limited to,"

1. ·the date your Disability started;
2. the cause of your Disability; and
3. the prognosis of your Disability.

(*Id.*) As part of the claims process, the claimant must "provide signed authorization for us to obtain and release medical and financial information, and any other items we may reasonably require." (*Id.* at AR 167.) This information includes "proof of continuing Disability." (*Id.*) Should the claimant "not provide satisfactory documentation within 60 days of the date we ask for it, [the] claim may be denied." (*Id.*)

This language does not allow the Plan Administrator to require objective medical evidence. The Plan requires "proof," a term that is undefined in the policy. The Oxford English Dictionary defines "proof" as "evidence sufficient (or contributing) to establish a fact or produce belief in the certainty of something." *See* "Proof, *n.*1," Oxford English Dictionary Online, *available at* <http://dictionary.oed.com/cgi/entry/00190047>; *see also* Fed.R.Evid. 201(b). This definition, which generally accords with the plain-meaning of the term, makes no distinction between subjective and objective evidence. Rather, it encompasses *all* types of evidence that contribute to establishing a fact or eliciting belief. Either subjective or objective evidence will do.

The second potential basis for the Plan Administrator to require objective medical

---

5. Were such a conflict to exist, the Court would be "free to cho[o]se which line of cases to follow," *United States v. Slicer,* 361 F.3d 1085, 1087 n. 1 (8th Cir.2004), and would follow the approach set forth by *House,* not simply because it is first, *see Kostelec,* 64 F.3d at 1228 n. 8, but because it represents the better rule of law.

evidence is the Plan's generalized grant of discretion. As stated in this provision,

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for any entitlement to Plan benefits in accordance with the terms of the Plan.

(Mohs Aff. Ex. A at AR 174.) This provision instructs that interpretations made pursuant to that authority "shall be given full force and effect, unless it can be shown that the interpretation was arbitrary and capricious." [6] (*Id.*)

The generalized grant of discretion does not provide an adequate basis for requiring objective evidence. Were this provision sufficient, the Eighth Circuit would likely have upheld the plan administrator's decisions in *House* and *Collins;* rather, in each case, one precedential and one persuasive, the court overturned a denial of benefits made under similar discretionary authority where the decision was motivated by the subjective character of the claimant's evidence. *See House,* 241 F.3d at 1048; *Collins,* 87 Fed.Appx. at 606. Indeed, *House* explicitly states that *"nothing* in the terms of the plan support [the insurer's] demand for 'objective medical evidence.'" *House,* 241 F.3d at 1048 (emphasis added). Because the plan administrator's discretionary authority can only stem from "the terms of the plan," *id.; see also Firestone Tire,* 489 U.S. at 115,

109 S.Ct. 948, that "nothing" includes the grant of discretion.

ERISA plans are free to contract for whatever type of evidence they choose. The word "proof" is sufficiently broad to encompass either subjective or objective evidence, and the Court will therefore not permit the Plan Administrator to make that distinction *post hoc.* To allow such an untimely redrafting of the Plan would be to allow MetLife to gain an unbargained-for benefit so as to "defeat the legitimate expectations of [Plan] participants." *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 443 (3d Cir.1997). This is especially so with fibromyalgia, where the disease is "difficult to diagnose" and the main disabling symptoms—such as "fatigue, sleep disturbances, lack of concentration, changes in mood or thinking, anxiety and depression"—are subjective. *Lang,* 125 F.3d at 796. The Court therefore determines that the generalized grant of discretion did not provide a basis for the Plan Administrator to require objective medical evidence. Indeed, in the context of this disease and this Plan, it was arbitrary and capricious to do so.

## B. The Effect on the Standard of Review

This conclusion has a substantial effect on the standard of review. The Plan Administrator's central rationale for upholding the denial of Pralutsky's claim on appeal was that there were "essentially no objective medical findings to support the pathology." (Mohs Aff. Ex. A at AR 174.)

---

6. The Plan also provides that documents submitted in support of the claim be "subject to [MetLife's] satisfaction." (Mohs Aff. Ex. A at AR 153.) The Eighth Circuit has interpreted this language as granting discretion coextensive with the grant of discretion described above. *See Walke,* 256 F.3d at 840; *Ferrari v. Teachers Ins. and Annuity Ass'n,* 278 F.3d 801, 806 (8th Cir.2002); *see also Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 252 (2d Cir.1999) ("Every plan that is administered requires submission of proof that will 'satisfy' the administrator.... Thus, saying that proof must be satisfactory 'to the administrator' merely states the obvious point that the administrator is the decision-maker, at least in the first instance."). Put another way, the "satisfaction" language does allow MetLife to require *more* from the evidence than its discretion already allows.

In fact, the Plan Administrator specifically instructed the outside medical consultant to determine whether her condition was "supported by clinical objective findings." (*Id.* at AR 93.) Justified by neither the law nor the Plan, the use of this standard means that an "arbitrary decision," *Layes,* 132 F.3d at 1250, was "reached without reflection and judgment," *Buttram v. Central States, S.E. & S.W. Areas Health & Welfare Fund,* 76 F.3d 896, 900 (8th Cir. 1996). It therefore constitutes a serious procedural irregularity. Moreover, because this error was linked to—and, in fact, lay at the heart of—the decision to deny benefits, less deferential review is appropriate.[7]

## II. Sliding–Scale Review

 Having determined that Pralutsky has "traverse[d] the *Woo* gateway," *Schatz v. Mutual of Omaha Ins. Co.,* 220 F.3d 944, 949 (8th Cir.2000), the Court will review MetLife's denial of benefits under a "sliding scale" standard. Under this standard, "the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity." *Woo,* 144 F.3d at 1162. Because the procedural irregularity was egregious—indeed, it so pervaded the analysis as to make the task of separating the error from the substantive decision nearly impossible—the Court will "require that the record contain substantial evidence bordering on a preponderance" to support the denial of benefits. *Id.*

To qualify as disabled under the policy, Pralutsky was required to demonstrate that she was both (1) receiving appropriate care, and (2) had suffered a substantial reduction in her earning capacity due to illness. Under the Plan, "appropriate care" is defined as medical care that meets the following criteria:

1. it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;

2. it is necessary to meet your basic health needs and is of demonstrable medical value;

3. it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;

4. it is consistent with the diagnosis of your condition; and

5. its purpose is maximizing your medical improvement.

(Mohs Ex. A at AR 156.) The Plan also required Pralutsky to demonstrate that, "due to sickness, pregnancy or accidental injury . . . [she was] unable to earn more than 80% of [her] Predisability Earnings or Indexed Predisability Earnings at [her] Own Occupation for any employer in [her] Local Economy . . . ." (*Id.* at AR 155.)[8]

---

7. Although abandoned on appeal, the original grounds for the denial of claim also demonstrate a misapplication of the Plan language. The Plan Administrator initially denied coverage because "[m]edical documentation does not support *severity* of diagnosis for fibromyalgia." (Mohs Aff. Ex. A at AR 76 (emphasis added).) Not only, however, does the Plan not contain a "severity" requirement, but, as the Seventh Circuit has recognized, "[t]here *are* no laboratory tests for the presence or severity of fibromyalgia." *Sarchet,* 78 F.3d at 306–07 (emphasis added).

8. As discussed above, the Plan requires claimants to provide "proof" of disability. (Mohs Aff. Ex. A at AR 166.) Proof includes the date, cause, and prognosis of the disability. (*Id.*) Here, Pralutsky submitted evidence that "weakness & pain" resulting from an illness had rendered her "unable to do [her] duties" since July 31, 2001. (*Id.* at AR 24, AR 25, AR 33.) She also submitted evidence that her disability was caused by fibromyalgia. (*Id.* at AR 44, AR 86.) Finally, she submitted evidence regarding her prognosis, including the opinion of her doctors that, "while time

■ Under these requirements, the record does not contain substantial evidence—whether bordering on a preponderance or not—to justify the denial of benefits. The Plan Administrator initially denied Pralutsky's claim because, in part, she was not "aggressively treating" her condition. (*Id.* at AR 76.) The Plan, however, does not require that treatment be "aggressive[ ]"; it requires that it be "appropriate," in that it be from a suitable doctor, necessary to meet health needs, consistent with medical guidelines, and for the purpose of maximizing improvement. MetLife, by not affirming the challenge to Pralutsky's care on appeal, has effectively conceded this point. (*See id.* at AR 100.) Indeed, Dr. Chou, MetLife's own reviewing physician, stated that "[t]he records support that Ms. Pralusky is receiving appropriate and regular medical care at this time." (*Id.* at AR 100.) Given this statement—and the utter lack of evidence to the contrary—the Court finds that Pralutsky was receiving appropriate care as required by the Plan.

Pralutsky also demonstrated that, "due to sickness," she was unable to earn 80% of her pre-disability earnings at her occupation. According to the information before the Plan Administrator, Pralutsky doctors agreed that her illness "fit[ ] best into [the] fibromyalgia category," although she displayed "elements of chronic fatigue syndrome as well." (*Id.* at AR 66, 86.) While MetLife's doctor, Dr. Chou, disa-

greed with chronic fatigue syndrome diagnosis, he found that "the diagnosis of fibromyalgia *is* supported." (*Id.* at AR 99 (emphasis added).) As recounted by Dr. Ormiston, her neurologist, this disease caused Pralutsky significant pain and fatigue:

> The pain is perceived first in the legs and as that settles then she might get some pain in her arms as well then will feel totally exhausted.... The pain seems to start in her hips and work down her legs. It is worse at night. There are times when she wakes up feeling totally exhausted. Other times when she can have a few hours feeling [okay] before this comes on. No days without for a long time now.

(*Id.* at AR 42.) According to Dr. Chou, this "subjective pain and fatigue [is] consistent with fibromyalgia." (*Id.* at AR 100.)

Because of these subjective symptoms, Pralutsky was unable to perform—and, *a fortiori*, earn income at—her occupation. Dr. Tveten, Pralutsky's primary care physician, found her unable to work due to "recurrent pain, migratory in nature, and feelings of extreme weakness." (*Id.* at AR 37.) Dr. Ormiston, while initially optimistic she would improve, would not advise her to return to work because "[s]he simply can't"; indeed, he found that Pralutsky could not sit, stand, or walk for even a single hour of the day.[9] Even Dr. Chou

---

[might] lessen her symptoms," there "are very poor treatments for [fibromyalgia]." (*Id.* at AR 86.) This evidence, entirely unrebutted, satisfies the Plan's "proof" requirement.

9. Dr. Chou—considering only "the clinical evaluations, *objective* medical evidence and diagnostic test results"—concluded that Pralutsky could stand or walk for up to an hour a day during a typical work schedule. (*Id.* at AR 95, 94 (emphasis added).) Although he concluded that Pralutsky was therefore able to perform "sedentary type of work" (*id.* at

AR 100), this conclusion is "at odds with the generally recognized definition of such work," which states that "sedentary work generally involves up to *two hours of standing or walking*" during an eight-hour work day, *Connors v. Connecticut Gen. Life Ins. Co.,* 272 F.3d 127, 136 (2nd Cir.2001) (applying social security definition that accords with generally recognized definition in the context of ERISA claim for chronic fatigue syndrome) (internal quotations omitted). Pralutsky's job description suggests that her job required at least that. (Mohs Aff. Ex. A at AR 89–90.)

found "significant [self-reported] functional inability to work." (*Id.*) This evidence demonstrates a substantial, almost total, reduction in Pralutsky's earning capacity.

While Dr. Chou concluded that Pralutsky's impairment was "mild" and that she would be "able to perform at least sedentary type of work," the value of this opinion is erased by his insistence on objective medical evidence to justify her disability. As Judge Posner noted, with regard to *the same doctor* reviewing a claim for *the same condition*,

> [T]he gravest problem with Dr. Chou's report is the weight he places on the difference between subjective and objective evidence of pain. Pain often and in the case of fibromyalgia cannot be detected by laboratory tests. The disease itself can be diagnosed more or less objectively . . ., but the amount of pain and fatigue that a particular case of it produces cannot be. It is "subjective"— and Dr. Chou seems to believe, erroneously because it would mean that fibromyalgia could never be shown to be totally disabling, . . . that because it is subjective, [plaintiff] is not disabled.

*Hawkins v. First Union Corp. Long–Term Disability Plan,* 326 F.3d 914, 919 (7th

Cir.2003) (Posner, J.) (finding that insurer abused its discretion by denying benefits for fibromyalgia claim based on a lack of objective evidence). Almost to the letter, Dr. Chou has repeated these same errors here.[10]

██ Without the requirement of objective medical evidence, "[t]he record contains nothing more than scraps to offset the evidence presented" by Pralutsky. *Id.* While such a requirement may not be arbitrary and capricious in every instance, in the face of an "elusive and mysterious" disease like fibromyalgia whose "symptoms are entirely subjective," *Sarchet,* 78 F.3d at 306–07, it is arbitrary and capricious here. Accordingly, because the record does not contain substantial evidence to support the denial of benefits, the Court will grant Pralutsky's motion on her ERISA claim.[11]

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED:**

1. MetLife's Motion for Summary Judgment (Doc. No. 6) is **GRANTED IN PART**; to the extent Pralutsky alleges state law breach-of-contract,

10. For instance, while finding "significant subjective pain and fatigue," Dr. Chou nonetheless concluded that Pralutsky's impairment was "mild" due to a lack of "objective medical findings to support more significant impairment." (Mohs Aff. Ex. A at AR 100.) Likewise, Dr. Chou found that "[t]he subjective pain and fatigue are consistent with fibromyalgia; however, there is no objective abnormal finding . . . that would preclude her from performing any type of occupation." (*Id.*)

11. As a final matter, MetLife has, during the briefing and oral argument for this motion, raised for the first time a number of additional bases for rejecting Pralutsky's claim. While the Court is tempted to explain in detail why each of these rationales is defective—and

each *is* defective—it will not do so. Under ERISA, a denial of claim must be written "in a manner calculated to be understood by the claimant" and contain "[t]he specific reasons for the denial." 29 C.F.R. § 2560.503–1(g)(1)(i). In the Eighth Circuit, courts "are free to ignore ERISA plan interpretations that did not *actually furnish the basis* for a plan administrator's benefit decision" as communicated to the plan participant. *Marolt v. Alliant Techsystems, Inc.,* 146 F.3d 617, 620 (8th Cir.1998) (emphasis added). Because any other approach would allow ERISA claimants to be "sandbagged by after-the-fact plan interpretations devised for purposes of litigation," *id.,* the Court will "not consider [MetLife's] *post hoc* rationales." *Conley v. Pitney Bowes,* 176 F.3d 1044, 1049 (8th Cir. 1999).

that claim is DISMISSED WITH PREJUDICE; and

2. Pralutsky's Motion for Summary Judgment (Doc. No. 7) is **GRANTED**;

 (a) Pralutsky is awarded past-due long-term disability benefits and prejudgment interest;[12] and

 (b) MetLife shall reinstate Pralutsky in its long-term disability plan as a participant entitled to benefits under the Plan.[13]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

12. Prejudgment interest is appropriate because (1) MetLife "has continued to have use of th[e] money," (2) "the exact amount of liability on the plan[] was never in doubt," and (3) "an award of prejudgment interest is necessary in order ... [to] obtain 'appropriate equitable relief.'" *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1218 (8th Cir. 1981) (quoting 29 U.S.C. § 1132(a)(3)(B)).

13. Should Pralutsky move for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g), that motion must be made in accordance the time limits set forth in Local Rule 54.3. If filed, the motion shall be accompanied by a memorandum, affidavit, and supporting documents. The Court will provide MetLife with an opportunity to respond.