**Antonio LAO, Plaintiff,**

**v.**

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and UNUM Life Insurance Company of America, Defendants.**

No. CIV.03–2631(RHK/RLE).

United States District Court,
D. Minnesota.

May 26, 2004.

Joseph J. Mihalek, Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, MN, for Plaintiff.

Eric C. Tostrud and Gregory J. Meyers, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, for Defendant Hartford Life and Accident Insurance Company.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Between July 1, 1996, and October 1, 1998, St. Mary's Duluth Clinic in Duluth, Minnesota sponsored a long-term disability insurance plan ("the Plan") for its employees through Hartford Life and Accident Insurance Company ("Hartford"). Under the Plan, a participant suffering a twenty-reduction in "current[ ] earning[s]" due to disability is entitled to residual disability benefits. Dr. Antonio Lao, a physician at the Duluth Clinic, filed for benefits after he reduced his practice because of heart disease. Because the Clinic pays its physicians advances based on projected productivity, Lao's paycheck was not reduced until he was required to return excess advances the next fiscal year. Hartford—whose agreement with the Clinic expired *before* the end of the fiscal year—denied Lao's claim on the ground that his earnings were not affected during the plan period. Lao brought suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), and both sides have moved for summary judgment.

This case presents a narrow legal issue: Was it reasonable for Hartford to calculate Lao's current earnings based on the money he was advanced, rather than the money to which his actual productivity entitled him? The Court finds that it was not. Therefore, for the reasons below, the Court will grant Lao's motion and deny Hartford's motion.[1]

### Background

In late 1997, Dr. Antonio Lao, a fifty-nine-year-old internist at St. Mary's Duluth Clinic in Duluth, Minnesota, suffered chest pains and shortness of breath. (Meyers Aff. Ex. 1 at 89.) Lao's cardiologist diagnosed him with chronic atrial fibrillation and intermittent bardycardia. (*Id.* at 92.) Atrial fibrillation is

a disorder found in about 2 million Americans. In it the heart's two small upper chambers (the atria) quiver instead of beating effectively. Blood isn't pumped completely out of them, so it may pool and clot. If a piece of a blood clot in the atria leaves the heart and becomes lodged in an artery in the brain, a stroke results. About 15 percent

---

1. While Lao has also sued UNUM Life Insurance Company of America ("UNUM")—which began providing disability insurance for Duluth Clinic employees on October 1, this claim has been resolved. The Court will therefore dismiss the Complaint against UNUM (Doc. No. 1), as well as UNUM's corresponding cross-claim for contribution and indemnification (Doc. No. 4).

of strokes occur in people with atrial fibrillation.

(American Heart Association, "Atrial Fibrillation," available at <http://www.american heart.org/presenter.jhtml?identifier=4451>); *see also* Fed.R.Evid. § 201(b). Bradycardia is an extreme slowing of the heart. (American Heart Association, "Statistical Fact Sheet," available at < http://www.americanheart.org/downloadable/heart/1079596866713FS27SD CA4.pdf>); *see also* Fed.R.Evid. § 201(b).

Effective July 1, 1998, on the advice of his physicians, Lao stopped taking night calls and ended his hospital practice. (Meyers Aff. Ex. 1 at 92.) He continued, however, to see patients at his office. (*Id.*) At this time, the Duluth Clinic offered disability coverage through Hartford. Three months later, on October 1, 1999, however, the Clinic changed disability providers. Because Hartford's disability plan required that claimants show 360 days of continuous disability to be eligible for benefits—the so-called "elimination period"—Lao was not eligible for disability benefits until nearly a year after he reduced his practice. By this time, Hartford was ten months removed as the Clinic's disability insurance provider.

On August 9, 1999, Lao applied for benefits. Under the Plan, participants qualified for residual disability benefits if, among other things, a disability caused them to earn at least twenty-percent less than they had before the disability. As set forth in the Plan,

> Residually Disabled means that you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full-time basis, except that:
>
> (1) you are performing at least one of the material duties of your own or another occupation on either a full-time or part-time basis;

> (2) you are under the continuous care of a physician; and
>
> (3) you are currently earning at least 20% less per month than your indexed Pre-disability Earnings due to the same injury or sickness that caused the disability. . . .

(*Id.* Ex. 3 at 120.)

On September 24, 1999, Hartford denied Lao's claim. The Plan Administrator found that Lao had not suffered a twenty-percent loss in "current earning[s]" as the Plan required. (*Id.* Ex. 5 at 77.) The Clinic, acting on behalf of Lao, submitted additional payroll information indicating that he met the twenty-percent threshold and asked Hartford to reopen the claim. It also tried to clarify what it called a "misunderstanding" with regard to Lao's compensation:

> During both of the fiscal years in question, Dr. Lao had overpayment situations develop. These resulted from the fact that Dr. Lao's practice had changed significantly and we were not notified of the change. As a result, overpayments developed which traditionally are subtracted from future years compensation payments.

(*Id.*)

The Plan Administrator, after reviewing the new information, again denied the claim. In so doing, he relied upon the timing of the returned advance. "According to our calculations, you did not suffer a loss of earnings until July 1999. However, since the policy was cancelled effective 10/1/98, we are unable to consider providing benefits because the policy was no longer in force as of July 1999." (*Id.* Ex. 4 at 37.)

Lao appealed this decision twice. In each instance, Lao, through the Duluth Clinic, provided documentation indicating that his advance failed to take into account

his reduced production in July, August, and September 1998, and that his "current earning[s]" were the amount to which his production entitled him, rather than the size of his advance. After the Plan Administrator denied his first appeal, Lao sent a letter from the Clinic's general counsel explaining the manner in which the Clinic pays its physicians:

Our system, like most physician systems which pay on production, give physicians a monthly draw, usually at a rate that will pay the physician about 70–75% of their total compensation. At the end of the year, when the physician's production is known, and total compensation is determined, there is then an adjustment, usually a fairly sizable bonus. But what also happens, (and this is what happened in Dr. Lao's case) is that there is a bonus payment made, but it is relatively small because there was a drop in production and the organization has to recoup much of what had been overpaid in the monthly draw. What you need to look at is that for the year ending June 30, 1998, Dr. Lao earned and was paid approximately $126,000. Dr. Lao then became disabled and his earnings for the ensuing year dropped to $96,000—more than a 20% reduction in pay. During that year his *paycheck* was not reduced, because that is simply a predetermined draw, but in fact, his actual *earnings* for the year did drop.

(*Id.* Ex. 13 at 18–19.)

On April 26, 2001, the Plan Administrator made the "final determination" regarding Lao's claim. (*Id.* Ex. 14 at 16.) While acknowledging that Lao "may have suffered a loss of earnings sufficient to satisfy the Policy definition beginning in July 1999"—when he repaid the excess advance—"your policy [was] cancelled on October 1, 1998. As a result, you no longer had coverage under this Policy on July 1, 1999." (*Id.* at 15.) The Plan Administrator therefore denied his claim, and indicated that it would "remain closed." (*Id.* at 16.) This suit followed.

**Standard of Decision**

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). It is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court views the evidence, as well as all reasonable inferences, in a light most favorable to the nonmoving party. *See Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996); *see Adkison v. G.D. Searle & Co.,* 971 F.2d 132, 134 (8th Cir.1992). The moving party carries the burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.,* 224 F.3d 735, 738 (8th Cir.2000). The nonmoving party may not rest upon the allegations or denials of its pleadings. Rather, the nonmovant must establish the existence of specific facts that create a genuine issue for trial. Neither mere allegations nor denials are sufficient. *See Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505.

On summary judgment, the court does not weigh facts or determine the credibility of affidavits and other evidence. *See id.* at 249, 106 S.Ct. 2505. The nonmovant cannot, however, avoid summary judgment by highlighting some alleged factual dispute between the parties. Instead, the disputed fact must be "outcome determinative under prevailing law"; it must be material to an essential element of the specific theory of recovery at issue. *See Get Away Club. Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992). In essence, the

court determines whether there is a need for a trial. *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505.

## Analysis

### I. ERISA Standard of Review

An ERISA plan participant may bring a civil suit "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Where, as here, a plan gives the administrator "discretionary authority to determine eligibility for benefits," the Court generally reviews the administrator's decision for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). This deferential standard stems from courts' hesitancy to interfere with the administration of benefits plans. *Layes v. Mead Corp.,* 132 F.3d 1246, 1250 (8th Cir.1998).

Courts will apply a less deferential standard of review to a plan administrator's decision, however, when a plaintiff presents "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998). Not only must the evidence be material and probative, but the alleged conflict or procedural irregularity must be tied to the denial of benefits. *Id.* at 1161. To obtain review under the less deferential standard, a plaintiff must offer evidence that "gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." *Layes,* 132 F.3d at 1250 (internal quotation marks omitted).

Here, the Court need not decide whether, or to what extent, to deviate from the abuse-of-discretion standard of review because, on the facts of the case, any standard produces the same result. *See Barnhart v. UNUM Life Ins. Co.,* 179 F.3d 583, 589 n. 9 (8th Cir.1999) (noting that a plaintiff who satisfies *Woo*'s threshold requirements "will more than likely have substantial evidence showing that the fiduciary's decision was arbitrary and capricious once the sliding scale is invoked to lessen the court's deference for the administrator's decision").

### II. Application of the Abuse of Discretion Standard

■ Under an abuse of discretion standard, a plan administrator's decision to deny benefits must stand if it is reasonable, that is, if it is supported by "substantial evidence." *Fletcher–Merrit v. NorAm Energy Corp.,* 250 F.3d 1174, 1179 (8th Cir.2001). Substantial evidence is "more than a scintilla but less than a preponderance." *Woo,* 144 F.3d at 1162 (quoting *Donaho v. FMC Corp.,* 74 F.3d 894, 900 n. 10 (8th Cir.1996)). As long as the plan administrator's "findings are reasonable, they may not be displaced on review even if the court might have reached a different result had the matter been before it de novo." *Donaho,* 74 F.3d at 900. "Deferential review is not no review," however, and "deference need not be abject." *Gallo v. Amoco Corp.,* 102 F.3d 918, 922 (7th Cir.1996). "In some cases, the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Hess v. Hartford Life & Acc. Ins. Co.,* 274 F.3d 456 (7th Cir.2001).

This dispute, as Hartford contends, turns on the reasonableness of the Plan Administrator's interpretation of the amount Lao was "currently earning." If the Plan Administrator could reasonably calculate Lao's earnings based on the mon-

ey he was advanced, rather than the money to which his production entitled him, then Lao's drop in earnings fell short of the twenty-percent threshold. If, however, it was unreasonable for the Plan Administrator to calculate earnings in that manner, then the loss exceeded twenty percent. In the latter case, but not the former, Lao would be entitled to benefits.

■ To determine the reasonableness of a plan administrator's interpretation, the Court looks to the factors set forth in *Finley v. Special Agents Mut. Benefit Assoc.,* 957 F.2d 617, 621 (8th Cir.1992). These are (1) whether that interpretation is consistent with the goals of the Plan, (2) whether it renders any language of the Plan meaningless or inconsistent, (3) whether it conflicts with the requirements of ERISA, (4) whether the trustees have interpreted words at issue consistently, and (5) whether their interpretation is contrary to the clear language of the Plan. *Id.;* see also *Cavegn v. Twin City Pipe Trades Pension Plan,* 333 F.3d 879, 883 (8th Cir. 2003). The Court will address the last factor first, and then turn to the remaining four.

### A. Contrary to the Plan Language

■ First, the Court considers if the Plan Administrator's interpretation was contrary to the clear language of the Plan. Courts give "significant weight" to "a misinterpretation of unambiguous language in a plan." *Lickteig v. Business Men's Assur. Co. of America,* 61 F.3d 579, 585 (8th Cir.1995). Indeed, where plan language is clear, the Court will "not defer to a contrary interpretation." *Id.* (quoting *Davis v. Burlington Indus., Inc.,* 966 F.2d 890, 895 (4th Cir.1992)). "When the trustees' interpretation of a plan is in direct conflict with the express language in a plan, this action is a very strong indicator of arbitrary and capricious behavior." *Id.* (quot-

ing *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 314 (5th Cir.1982)).

■ Read in light of this ordinary meaning, "currently earning" is not ambiguous. "A term is ambiguous if it is subject to reasonable alternative interpretations." *Bill Gray Enters., Inc. Employee Health and Welfare Plan v. Gourley,* 248 F.3d 206, 218 (3d Cir.2001). Where, however, "the text of the plan is clear and subject to only one interpretation, the inquiry is ended." *Smith v. United HealthCare Services,* 2003 WL 22047861 at *6 (D.Minn. 2003) (Montgomery, J.). The phrase "currently earning is subject to only one interpretation." Here, what one "currently earn[s]" is what one presently becomes entitled to as an "equitable return for work done." *Webster's Third New International Dictionary* 714 (1986).

Hartford urges a reading that conflates earnings with receipts. Indeed, in oral argument, Hartford acknowledged that it "simply looked at what Dr. Lao received." (Audio Tape: Oral Argument (May 20, 2004).) It also advanced a dictionary definition:

> If you take the dictionary definition, "to earn" is defined in Webster's ... as "to *receive* as return for effort and especially for work done or services provided." I think Dr. Lao is looking only at the first part of the earnings, and that is whether or not this is something that he *earns.* And a whole other part of earnings and an acceptable definition of earnings is, what do you get?

*Id.* This assertion, even by Hartford's own definition, is not correct. While "earning" does involve receiving, it also requires that the receipts be given "as return for effort." *Id.* "[E]arning" clearly contemplates an exchange: work provided for compensation received. Receipt alone does not suffice. Lao's paycheck, while received, consisted of both earned and unearned income. Because Lao was required to return the un-

earned portion, that portion could not reasonably be considered "earning[s]".

■ This finding is consistent with the Plan's basis in contract. An ERISA plan is a "creature[ ] of contract law," *Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan,* 713 F.2d 247, 252 (7th Cir. 1983), and as long as its provisions are in accord with the governing statute, the rights and responsibilities of each party "are bounded by the terms of the agreement," *Pralutsky v. Metropolitan Life Ins. Co.,* 316 F.Supp.2d 840, 848, 2004 WL 963255, *8 (D.Minn. 2004) (Kyle, J.). While other plans define compensation in terms of "draw or salary," *see, e.g., Kukowski v. Fortis Benefits Ins. Co.,* 2001 WL 474321, at *6 (D.Minn. May 2, 2001) (Frank, J.), Hartford expressly contracted for money "currently earn[ed]." Having written that language into the agreement, Hartford may not now wish it away. "[C]urrently earning" means exactly that, and it cannot be read to include an unearned advance or draw.[2]

Because the Plan Administrator's interpretation is contrary to the clear language of the Plan, this factor "significantly weigh[s]" against the reasonableness of that interpretation. *Lickteig,* 61 F.3d at 585.[3]

## B. The Remaining Factors

With regard to the remaining four *Finley* factors, the Court first examines whether Hartford has interpreted "current earning[s]" consistently. There is no evidence before the Court with regard to the consistency, or lack thereof, of Hartford's interpretation. While Hartford suggests that this factor therefore hangs in its favor, "if a[ ] [consistent] interpretation is unreasonable from the beginning, such an interpretation may still be arbitrary and capricious." *Morgan v. Mullins,* 643 F.2d 1320, 1324 n. 4 (8th Cir.1981). Indeed, a consistently unreasonable interpretation is arguably worse than an inconsistently unreasonable one. The Court therefore, under *Morgan,* affords this presumed consistency little weight in the analysis.

The Court next considers whether the Plan Administrator's interpretation is consistent with the goals of the Plan. A plan interpretation that "erroneously deprives employees of benefits which would otherwise be due them" cannot be consistent with plan objectives. *Lickteig,* 61 F.3d at 585. Indeed, by its own language, the Plan makes clear that its aim is to compensate disabled employees for their lost *earnings,* rather than advances or other

---

**2.** Nor can it be read, under any circumstance, to include a bonus earned on the basis of the prior fiscal year's production. While the Plan mandates that pre-disability earnings be established with reference to bonuses earned during the two previous calendar years—presumably to get a full picture of pre-disability earnings—there is nothing in the plan that requires this approach with respect to "current[ ] earning[s]." Where, as here, the bonus has no relation to the amount the claimant earns or is capable of earning after disability, it is nonsensical to use that figure to gauge the financial effect of disability. Simply put, those earnings were not current. This error carries Lao over the residual disability threshold, and provides sufficient reason, by itself, to grant Lao's motion.

**3.** To support the opposite view, Hartford relies on *Zander v. Continental Casualty Co.,* 61 Fed.Appx. 963 (7th Cir.2003), an unpublished per curiam Seventh Circuit opinion. This opinion, however, does not support the weight accorded to it. While the court in *Zander* refused to recognize a deferred compensation scheme—and thus, equated earnings with income—it expressly did so because "documentation proving (or disproving) this unusual deferred payment arrangement is essential, [and] neither party bothered to memorialize it in the record." *Id.* at 966. Without evidentiary basis, "this deferred payment theory fails *because it has no foundation in the record.*" *Id.* at 967 (emphasis added).

unearned receivables. Just as Hartford's interpretation cannot reasonably be squared with the Plan language, so too does it conflict with the Plan's clear goals. This factor therefore tips against the Plan Administrator's interpretation.

The final two factors—whether the interpretation conflicts with ERISA or renders Plan language Plan inconsistent—are neither here nor there. While these two factors do not weigh against the reasonableness of the interpretation, they are "insufficient to overcome the fact that [Hartford's] interpretation runs contrary to the clear language of the plan." *Id.*

### C. Summary

Weighing the five *Finley* factors, the Court concludes that they come down decidedly against the reasonableness of the Plan administrator's decision. While three of the five factors mildly favor Hartford, they are, as interpreted in *Lickteig,* insufficient to overcome the "significant weight ... given to such a misinterpretation of [the] unambiguous language in [the] plan." *Id.* The Court therefore concludes that the Plan Administrator's interpretation, which

was based exclusively on a defective interpretation of the Plan language, was arbitrary and capricious.

Lao is "residual[ly] disab[led]" under the Plan. Hartford denied the claim on the sole ground that Lao was not "currently earning at least 20% less per month than [his] indexed Pre-disability Earnings." (*Id.* Ex. 3 at 120.) This is clearly not so. Calculated in a manner consistent with the ordinary meaning of "currently earning," Lao's July 1998 earnings fell well-below the twenty-percent threshold.[4] Although Hartford suggests it *could have* denied Lao's claim on a number of other bases, the Court is "free to ignore ERISA plan interpretations that did not actually furnish the basis for a plan administrator's benefit decision." *Marolt v. Alliant Techsystems, Inc.,* 146 F.3d 617, 620 (8th Cir. 1998) (emphasis added). Because any other approach would allow ERISA claimants to be "sandbagged by after-the-fact plan interpretations devised for purposes of litigation," *id.,* the Court will "not consider [Hartford's] *post hoc* rationales," *Conley v. Pitney Bowes,* 176 F.3d 1044, 1049 (8th Cir.1999).[5]

---

4. Under the definition of "currently earning" adopted by the Court, Lao is entitled to Plan benefits under any calculation. By the Court's way of thinking—although its holding does not rest on these figures—the Plan Administrator's calculation diverges from the plain meaning of "currently earning" in at least four respects. First, it fails to take into account the sum deducted from his fiscal year 1999 earnings due to overpayments the previous fiscal year. Thus, $261 (1/12 of $3,132) must be added to the July 1998 draw of $9,185. Second, the calculation should have taken into account the extent to which Lao was overpaid in July of 1998. $1,512.92 (1/12 of $18,155) must therefore be subtracted from the subtotal. Third, the Plan Administrator should have included 1/12th of the *current* rather than the *prior* fiscal year's bonus to calculate the extent to which disability impacted Lao's earnings. Thus, a bonus of $25 (1/12 of $300), rather than $585.17 (1/12 of

$7,022), should also be added to the subtotal. Finally, the Plan Administrator clearly erred in concluding that Lao's nursing home stipend was paid monthly throughout fiscal year 1999. The Court finds only eight such payments, and none during July 1998. Assuming—as the Plan Administrator did—that money was equally earned throughout the year, July's share would be $225 rather than $300. (*See* Meyers Aff. Ex. 10 at 29.) All told, Lao's current earnings for July 1998 were, at most, $8,183.08, or 66.53% of Lao's Monthly Basic Rate of Earnings—a drop in earnings well in excess of 20%.

5. Aspects of the claim on which the Plan Administrator did not exercise his discretion are subject to the Court's de novo review. *See Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1328 (8th Cir.1995). Under that review, the Court finds that Lao clearly satisfied the remaining Plan terms regarding residual

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED:**

1. Hartford's Motion for Summary Judgment (Doc. No. 18) is **DENIED;**

2. Lao's Motion for Summary Judgment (Doc. No. 14) is **GRANTED;**

   (a) Lao is awarded past-due long-term residual disability benefits and prejudgment interest;[6] and

   (b) Hartford shall reinstate Lao in its long-term disability plan as a participant entitled to benefits under the Plan.[7]

3. The Complaint against UNUM (Doc. No. 1) is **DISMISSED WITH PREJUDICE;**

4. UNUM's Cross–Claim against Hartford (Doc. No. 4) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

disability from July 1, 1998 through the end of the elimination period and beyond. The undisputed evidence demonstrates that Lao (1) was prevented by his heart condition from doing material and substantial elements of his job including night calls and hospital practice (Meyers Aff. Ex. 1 at 85, 89, 93); (2) continued to perform at least one of the material duties in the form of office practice (*id.* at 89); and (3) was under the continuous care of Dr. C.E. Heltne from at least December 8, 1997 to July 11, 1999 (*id.* at 92). Because Dr. Lao became disabled while insured under the Plan, remained disabled throughout and beyond the elimination period, and submitted conclusive proof of loss, he is entitled to residual disability benefits under the Plan. (*See id.* at 16.)

6. Prejudgment interest is appropriate because (1) Hartford "has continued to have use of th[e] money," (2) "the exact amount of liability on the plan[] was never in doubt," and (3) "an award of prejudgment interest is necessary in order ... [to] obtain 'appropriate equitable relief.'" *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1218 (8th Cir.1981) (quoting 29 U.S.C. § 1132(a)(3)(B)).

7. Should Lao move for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g), that motion must be made in accordance with the time limits set forth in Local Rule 54.3. If filed, the motion shall be accompanied by a memorandum, affidavit, and supporting documents. The Court will provide Hartford with an opportunity to respond.